**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FREDERICK E. BOUCHAT,
             *Plaintiff-Appellant,*

v.

BALTIMORE RAVENS FOOTBALL CLUB,
INCORPORATED, a/k/a Baltimore
Ravens, Incorporated; NATIONAL
FOOTBALL LEAGUE PROPERTIES,
INCORPORATED,
             *Defendants-Appellees.*

v.

JONATHAN MORGAN,
             *Movant.*

No. 02-1999

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-97-1470-MJG)

Argued: June 4, 2003

Decided: October 8, 2003

Before WIDENER, WILKINSON, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the majority opinion, in which Judge Wilkinson joined. Judge Widener wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Howard J. Schulman, SCHULMAN & KAUFMAN, L.L.C., Baltimore, Maryland, for Appellant. Robert Lloyd Raskopf, WHITE & CASE, L.L.P., New York, New York, for Appellees. **ON BRIEF:** Marc E. Ackerman, WHITE & CASE, L.L.P., New York, New York; George Beall, HOGAN & HARTSON, L.L.P., Baltimore, Maryland, for Appellees.

**OPINION**

KING, Circuit Judge:

This appeal arises from the damages phase of a protracted copyright dispute involving the Baltimore Ravens football team. Frederick Bouchat, the holder of the infringed copyright, raises several challenges to the district court's conduct of proceedings that culminated in a jury verdict finding him entitled to no portion of the infringers' profits. In particular, Bouchat asserts that the court erroneously failed to accord him the benefit of a statutory presumption that an infringer's revenues are entirely attributable to the infringement. For the reasons explained below, we affirm.

I.

On November 6, 1995, the National Football League ("NFL") announced that one of its teams, the Cleveland Browns, would shortly be moving to Baltimore. The team was to leave its entire Browns identity in Cleveland, and thus would need a new name and logo when it moved to its new Maryland home. Bouchat, a Baltimore security guard and amateur artist, became interested in the new team, and he began drawing logo designs based on the various names that the team was considering, including the name "Ravens." On or about December 5, 1995, Bouchat created a drawing of a winged shield (the "Shield Drawing") as a "Ravens" logo.

In March of 1996, the Baltimore team adopted the name "Ravens." In early April, Bouchat sent the Shield Drawing via fax to the Mary-

land Stadium Authority. Beside the Shield Drawing, Bouchat penned a note asking the Chairman of the Authority to send the sketch to the Ravens' president. Bouchat also requested that if the Ravens used the Shield Drawing, they send him a letter of recognition and an autographed helmet.

In a jury trial on the issue of liability, Bouchat's Shield Drawing was found to have been mistakenly used by National Football League Properties, Inc. ("NFLP") in NFLP's production of the Ravens' new logo, the "Flying B."[1] The Ravens had no knowledge that the NFLP had infringed anyone's work and assumed that the Flying B was an original work owned by NFLP. The Ravens used the Flying B as their primary identifying symbol, and the logo appeared in every aspect of the Ravens' activities, including uniforms, stationery, tickets, banners, on-field insignia, and merchandise.

## II.

On May 8, 1997, Bouchat filed suit in the District of Maryland, alleging that the Ravens and NFLP (collectively, the "Defendants") had infringed his copyright on the Shield Drawing and on several other drawings, and seeking ten million dollars in damages. The court bifurcated the case and first tried the liability issues. On November 3, 1998, the jury found that Bouchat had proven infringement of the Shield Drawing. After the court certified the liability verdict for interlocutory appeal, a divided panel of this Court affirmed the finding of liability. *Bouchat v. Baltimore Ravens, Inc.*, 228 F.3d 489 (4th Cir. 2000). We denied rehearing en banc, *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350 (4th Cir. 2001), the Supreme Court denied certiorari, *Baltimore Ravens, Inc. v. Bouchat*, 532 U.S. 1038 (2001), and the matter was returned to the district court for trial of the damages issue.

---

[1]NFLP is the Ravens' licensing agent: it grants third parties the right to use the logos and trade/service marks of the various NFL teams in connection with a variety of products and services. In this capacity, NFLP both helped to develop the Ravens' new Flying B logo, and sold to third parties the right to incorporate the Flying B in a wide range of merchandise, including apparel, books, athletic bags, and video tapes.

Bouchat sought damages from the Ravens and NFLP pursuant to 17 U.S.C. § 504(a)(1), which renders an infringer liable for "the copyright owner's actual damages and any additional profits of the infringer, as provided by [17 U.S.C. § 504(b)]."[2] Section 504(b), in turn, entitles the copyright owner to recover both "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Because Bouchat made no claim for actual damages, the sole question presented for resolution in the damages trial was the amount, if any, of the Defendants' profits that was attributable to the infringement.

In his complaint, Bouchat contended that some portion of essentially *all* of the Defendants' revenues was attributable to the infringing use of Bouchat's artwork.[3] To satisfy his initial burden under § 504(b), Bouchat presented evidence of the gross receipts from all NFLP and Ravens activities. The district court, however, awarded partial summary judgment to the Defendants with respect to all revenues derived from sources other than (1) sales of merchandise bearing the Flying B logo, and (2) royalties obtained from licensees who sold such merchandise (collectively, the "Merchandise Revenues"). *Bouchat v. Baltimore Ravens, Inc.*, 215 F. Supp. 2d 611, 619, 621 (D. Md. 2002). The court reasoned that "[i]f the use of the Flying B logo to designate the Ravens could not reasonably be found to have affected the amount of revenue obtained from an activity, the revenue from that activity could not reasonably be found attributable to the infringement." *Id.* at 617-18. Concluding that only the Merchandise

---

[2]Bouchat was not entitled to pursue statutory damages because the infringement was of an unpublished work and preceded copyright registration. 17 U.S.C. § 412(1).

[3]Bouchat conceded in the district court that there are a few categories of the Defendants' revenues that could not, in any part, be attributable to the infringement. So, for example, Bouchat did not seek to recover interest earned on Ravens' checking accounts, even though the checks bore the Flying B logo; nor did he seek to recover the revenues obtained from stadium rentals, even though the Flying B logo was prominently featured on the playing field. *See Bouchat v. Baltimore Ravens, Inc.*, 215 F. Supp. 2d 611, 616 (D. Md. 2002).

Revenues could reasonably be found to have been affected by the Defendants' unlawful use of the Flying B, the court excluded, as a matter of law, the remainder of the Defendants' revenues (collectively, the "Non-Merchandise Revenues") from the pool of income that the jury could consider in awarding § 504 damages.[4]

At the close of discovery, the district court further narrowed the scope of the Defendants' revenues from which the jury would be permitted to award § 504 damages, when it excluded certain portions of the Merchandise Revenues. *Bouchat v. Baltimore Ravens, Inc.*, Order, No. 97-CV-1470 (D. Md. July 9, 2002) (the "July Order"). Specifically, the court awarded partial summary judgment to the Defendants as to Bouchat's claims for profits from "minimum guarantee shortfalls,"[5] "free merchandise,"[6] trading cards, video games, and game programs (collectively, the "Excluded Merchandise Revenues"). *Id.* at 1-2.[7]

---

[4]The Non-Merchandise Revenues would include, for instance, revenues from the sale of game tickets, stadium parking, food, drinks (with the exception of those sold in special logo-bearing cups), broadcast rights, and sponsorships.

[5]Under NFLP's retail licensing agreements, licensed vendors of official, logo-bearing merchandise are required to pay a certain sum each year, regardless of whether any sales of licensed products actually occur. Thus, if actual sales fall short of what would be required to generate the guaranteed minimum royalty, a vendor must tender payment in the amount needed to make up the difference. This sum is a "minimum guarantee shortfall" payment. *See* J.A. 1317-26.

[6]Under NFLP's retail licensing agreements, a licensed vendor of official, logo-bearing merchandise must provide to NFLP, at no cost, a certain quantity of its licensed products each year. These products are referred to as "free merchandise." *See* J.A. 1317-26.

[7]The July Order also awarded summary judgment to the Defendants with respect to revenues received from "[o]ther" sources, including a "Nike settlement." July Order at 2 & n.3. The record, however, has not enabled us to divine the nature of these "other sources"; and in pressing his appeal, Bouchat has likewise shed no light on the matter. Accordingly, we must deem waived any objection that Bouchat might have had to the award of summary judgment with respect to these revenues. *See generally In re Apex Express Corp.*, 190 F.3d 624, 630 n.5 (4th Cir. 1999) (noting that issue not argued in appellant's brief is deemed waived on appeal).

Though it recognized that the Defendants "ha[ve] the burden of proof," the court nonetheless ruled that, with respect to the minimum guarantee shortfalls and the free merchandise, there could be no rational connection between the particular source of revenue and the act of infringement; and that, with respect to the trading cards, video games, and game program sales, the Defendants had produced unrebutted evidence establishing that the revenues received from those sources were not attributable to the infringement. *Id.* at 2 & nn.1-6. Like the court's earlier summary judgment award, the July Order had the effect of narrowing the scope of the Defendants' revenues that the jury could consider in deciding the amount of § 504 damages, if any, that Bouchat would recover. Both the Non-Merchandise Revenues and a substantial portion of the Merchandise Revenues having thus been excluded, only those revenues derived from the sale of t-shirts, caps, souvenir cups, and other items bearing the Flying B logo (collectively, the "Non-Excluded Merchandise Revenues") would go to the jury for a finding on attributability.[8]

The damages trial was conducted over a period of six days, from July 17 to 24, 2002. On July 23, 2002, at the close of the evidence, the jury was asked to decide whether the Defendants had proven, by a preponderance of the evidence, that the Non-Excluded Merchandise Revenues were attributable entirely to factors other than the Defendants' infringement of Bouchat's copyright. If the jury found that they were not, then it was charged to decide the percentage of the Non-

---

[8]By the July Order, the court also granted in part several of the Defendants' motions to exclude evidence. Specifically, the court ruled that Bouchat would not be permitted to raise accounting issues regarding the calculation of the Defendants' gross revenues. Nor would he be allowed to introduce evidence pertaining to Defendants' revenues earned outside of the relevant time frame. The court forbad references to the Defendants' finances unrelated to the use of the Flying B logo, and it limited the issues at trial to a determination of the extent to which the Non-Excluded Merchandise Revenues were attributable to the appearance of the infringed artwork. *Id.* at 3-6.

Also prior to trial, the court ruled that there was no genuine issue of fact between the parties either as to the amount of the Defendants' gross revenues, or as to the expenses that would need to be deducted to compute total profits. J.A. 525-26.

Excluded Merchandise Revenues attributable to factors other than the infringement.

After a full day of deliberations, the jury answered the first question in the affirmative, thereby denying Bouchat any monetary recovery. On July 26, 2002, the court entered judgment on the jury verdict. Bouchat filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

III.

A.

Bouchat's primary contention on appeal is that the district court erred in awarding partial summary judgment to the Defendants with respect to certain portions of the Defendants' revenues. In particular, Bouchat asserts that the court failed to give him the benefit of the § 504 statutory presumption that an infringer's revenues are entirely attributable to the infringement. That presumption, he maintains, creates a question of material fact that cannot be resolved on summary judgment. Thus, he asserts, whether any portion of an infringer's revenues are attributable to some source other than the infringement is a question that can be resolved *only* by a jury. As explained below, we disagree.

1.

We review de novo a district court's award of summary judgment. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1127-28 (4th Cir. 1987). Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

2.

Bouchat seeks to recover damages pursuant to 17 U.S.C. § 504(b) for the Defendants' infringement of his copyright. Section 504(b) entitles a successful copyright plaintiff to recover "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). The statute goes on to specify that,

> [i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

*Id.* Thus, § 504(b) creates an initial presumption that the infringer's "profits . . . attributable to the infringement" are equal to the infringer's gross revenue. *See Konor Enters., Inc. v. Eagle Publ'ns, Inc.*, 878 F.2d 138, 140 (4th Cir. 1989). Once the copyright owner has established the amount of the infringer's gross revenues, the burden shifts to the infringer to prove either that part or all of those revenues are "deductible expenses" (i.e., are not profits), or that they are "attributable to factors other than the copyrighted work." *Id.* Although § 504(b) places the burden on the infringer to demonstrate that certain portions of its revenues were due to factors other than the infringement, the infringer need not prove these amounts with mathematical precision. *See Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985); *cf. Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408 (1940) (holding that there need only be "reasonable approximation" of recoverable profits).

3.

Despite the existence of § 504(b)'s burden-shifting provision, summary judgment in favor of an infringer with respect to some portion of the infringer's gross revenues may, in the proper circumstances, be appropriate. Though our Court has not spoken directly on this point, several of our sister circuits have awarded partial summary judgment to infringers, excluding as a matter of law certain portions of an infringer's revenues from the jury's § 504(b) attributability inquiry. Furthermore, an award of partial summary judgment to an infringer

with respect to particular categories of revenue comports, in the proper circumstances, with the basic tenets of our Rule 56 jurisprudence.

a.

We begin by looking to the decisions of our sister circuits. The § 504(b) cases in which partial summary judgment in favor of an infringer with respect to part, or all, of the infringer's revenues has been found proper, fall roughly into two categories: (1) those in which there existed no conceivable connection between the infringement and a given revenue stream; and (2) those in which, despite the existence of a conceivable link, the plaintiff failed to offer anything more than mere speculation as to the existence of a causal connection between the infringement and the claimed revenues.

The Second Circuit recently affirmed an award of summary judgment to the infringer in a § 504(b) case that presented the first of these scenarios, concluding that there existed no conceivable connection between the infringement and a substantial portion of the revenues claimed by the plaintiff. *See On Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001). In *On Davis*, the plaintiff (Davis) had submitted evidence that, during and shortly after the Gap undertook an eyewear advertising campaign that infringed his copyright, the Gap's corporate parent realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year. *Id.* at 159. The *On Davis* court acknowledged that "a highly literal interpretation of the statute would favor" the plaintiff, since the statute requires that the copyright owner "present proof only of the infringer's gross revenue." *Id.* at 160 (quoting 17 U.S.C. § 504(b)). The court, however, held that "the term 'gross revenue' under [§ 504(b)] means gross revenue reasonably related to the infringement, not unrelated revenues." *Id.* Because the gross revenue of $1.668 billion that Davis submitted was derived in part from sales "that were in no way promoted by the [infringing] advertisement," the court affirmed the summary judgment award in favor of the Gap. *Id.* at 161.

The Ninth Circuit faced the second of the § 504(b) summary judgment scenarios in *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002). In *Mackie*, the plaintiff failed to offer anything more than mere specula-

tion as to the existence of a causal link between the infringement and the claimed revenues, and the court upheld an award of summary judgment in favor of the defendant infringer. *Id.* at 916. The dispute in *Mackie* arose out of the Seattle Symphony Orchestra's inclusion in its advertising brochure of an image of one of Mackie's sculptures. *Id.* at 912. The Symphony admitted that it had infringed Mackie's copyright, and Mackie asserted a claim against the Symphony for both actual damages and profits. *Id.* at 912-13. It was, in the abstract, at least conceivable that the infringement had caused — and would continue, in future seasons, to cause — the Symphony to generate more revenues than it otherwise would: after all, the Symphony presumably incorporated the image in its brochure with the ultimate goal of increasing its profits; and perhaps, unlikely as it may be, a recipient of the brochure was so enamored of the infringing image that he decided to become a patron of the Symphony. *See id.* at 916. However, as the Symphony noted when it moved for summary judgment, Mackie offered no evidence in support of his theory that the infringement had in fact boosted the Symphony's revenues. *Id.* at 913. When Mackie failed to respond to the summary judgment motion with even a single piece of evidence suggesting the existence of an actual causal connection, the trial court granted the Symphony's summary judgment motion. *Id.*

In affirming, the Ninth Circuit reasoned that, "to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits damages [i.e., damages for profits that have an attenuated connection to the infringement] under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement." *Id.* at 911. "Because Mackie [had] failed to adduce any non-speculative evidence that would even suggest a link between the infringement and the Symphony's supposedly enhanced revenues," summary judgment in favor of the Symphony was appropriate. *Id.*; *see id.* at 916; *see also Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed. Cir. 1999) (holding that plaintiff has "the burden" to demonstrate some nexus between infringement and profits before apportionment can occur); *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) (noting that "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors'

corporate income tax return in the record and rest your case for an award of infringer's profits").

b.

The *On Davis* and *Mackie* decisions, upholding awards of summary judgment to § 504(b) defendants, comport fully with our summary judgment jurisprudence. Summary judgment is not solely a defensive mechanism: Rule 56 expressly contemplates the availability of summary judgment to a claimant. *See* Fed. R. Civ. P. 56(a). That a movant bears the ultimate burden of proof or persuasion — as does an infringer in the § 504(b) context — is no obstacle to a summary judgment award in favor of that party, so long as the requirements of Rule 56 are otherwise satisfied. *Cf. Meyer v. Worsley Cos., Inc.*, 881 F. Supp. 1014, 1021 (E.D.N.C. 1994) (awarding summary judgment to defendant who, under relevant statutory scheme, bore ultimate burden of proof, when defendant made requisite Rule 56 showing and plaintiff failed to respond with demonstration of existence of genuine dispute of material fact). Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must come forward and demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (holding that, once motion for summary judgment is properly made and supported, opposing party bears burden of showing, by means of affidavits or other verified evidence, that genuine dispute of material fact exists); *Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (holding that dispute regarding material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Furthermore, neither "[u]nsupported speculation," *Felty*, 818 F.2d at

1128, nor evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, *id.* at 250, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," *id.* at 248, "summary judgment, if appropriate, shall be entered," Fed. R. Civ. P. 56(e).

These general principles only further highlight the propriety of an award of summary judgment under circumstances such as those presented in *On Davis* and *Mackie*. Despite § 504(b)'s presumption that the recoverable "profits . . . attributable to the infringement" are equal to the infringer's gross revenues, the statute does not exempt the copyright plaintiff from the requirement of Rule 56 that he respond to a properly supported motion for summary judgment by "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Should the plaintiff fail so to respond — whether that failure is due to the absence of any conceivable connection between the infringement and the claimed revenues, or instead simply due to the plaintiff's inability to muster nonspeculative evidence in support of the alleged causal link — then summary judgment may properly be awarded to the infringer with respect to part or all of the contested revenues.

c.

In sum, we conclude that the Defendants could properly be awarded summary judgment with respect to any given revenue stream if either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, Bouchat offered only speculation as to the existence of a causal link between the infringement and the revenues. It is to these inquiries that we turn next.

4.

The Defendants derive revenues from six major sources: (1) sponsorships; (2) broadcast and other media licenses; (3) sale of tickets; (4) miscellaneous business activities, which appear to include provision of game-day stadium parking; (5) sale of official team merchan-

dise; and (6) royalties from licensees who sell official team merchandise. *See Bouchat*, 215 F. Supp. 2d at 615. The first four of these sources we characterize as the "Non-Merchandise Revenues," while the fifth and sixth are the "Merchandise Revenues." To briefly review the history relevant to this appeal: Early in the case, the court awarded partial summary judgment to the Defendants with respect to the Non-Merchandise Revenues, leaving the Merchandise Revenues for later consideration. *Id.* at 619, 621. Subsequently, the court awarded partial summary judgment to the Defendants with respect to certain portions of the Merchandise Revenues, to wit, the revenue received from: "minimum guarantee shortfalls"; "free merchandise"; trading cards; video games; and game programs. July Order at 1-2.[9]

Bouchat contends that, because of the Defendants' widespread use of the Flying B as the primary logo — and as an integral marketing tool — for the Baltimore Ravens, some portion of the revenues that the Defendants earned from both the Non-Merchandise Revenues and the Excluded Merchandise Revenues is attributable to the Defendants' infringement of his copyright. When the district court awarded summary judgment to the Defendants as to large segments of their revenues, however, it denied Bouchat the opportunity to prove this

---

[9]It should be noted that, while our precedents appear not to address head-on the propriety of a § 504(b) partial summary judgment like this one, we have made clear that it is appropriate to parse revenue streams as the district court did here. In *Walker v. Forbes, Inc.*, 28 F.3d 409 (4th Cir. 1994), we held that a trial court was within its discretion in permitting an infringer (Forbes) to introduce evidence at trial that tended to show that the use of a particular photograph in a special edition of *Forbes* magazine bore no causal connection to the advertising and subscription revenues that that edition generated. *Id.* at 411-12. The evidence indicated that the vast majority of Forbes's advertising and subscription profits were derived not from the contents of any one edition, but rather from the reputation of the magazine. *Id.* The plaintiff contended that this sort of evidence allowed the jury to impermissibly "sever" whole categories of revenue in determining the proper amount of damages to award. We rejected this contention, though, acknowledging that it is proper to parse an infringer's various revenue streams and assess them categorically, rather than to consider all revenues together. *Id.* Thus, the district court did not err insofar as, at the summary judgment stage, it addressed the Defendants' revenues category-by-category.

contention to the jury. Despite the fact that § 504(b) places on the infringer the burden of proving that revenues are not attributable to the infringement, summary judgment was appropriate with respect to both the Non-Merchandise Revenues and the Excluded Merchandise Revenues.

As detailed above, we analyze the excluded revenue streams in two steps. We first consider whether any of the Non-Merchandise Revenues and the Excluded Merchandise Revenues lacked a conceivable connection to the infringement. If so, summary judgment in favor of the Defendants with respect to those revenues was proper. Turning then to the remaining excluded revenues, we inquire whether, despite the existence of a conceivable connection between those revenues and the infringement, Bouchat offered only speculative evidence of such a causal link in response to a properly supported motion for summary judgment. If so, then summary judgment in favor of the Defendants was appropriate with respect to these revenues as well.

a.

Of all the excluded revenues, only the revenues from minimum guarantee shortfalls and free merchandise lack all conceivable connection to the Defendants' infringement of Bouchat's copyright. Because no rational trier of fact could find that these two sub-categories of the Excluded Merchandise Revenues were affected by the Defendants' adoption of the infringing Flying B logo, the court properly removed them from the pool of Defendants' revenues submitted to the jury for consideration under § 504(b).

The levels of each licensee's minimum guarantee and free merchandise obligation were established, *ex ante*, by the terms of the licensee's contract with NFLP; neither figure could fluctuate in response to consumer behavior. As a consequence, the amount of revenue that the Defendants received in the form of minimum guarantee shortfalls and free merchandise was necessarily independent of any reaction that any individual might have had to the Flying B logo. Whereas it is at least hypothetically possible (albeit highly unlikely) that an individual became so enamored of the infringing aspects of the Flying B logo that he was thus inspired to purchase tickets for the Ravens' games, to pay for parking, to buy non-logo-bearing conces-

sions, and thus to boost the Defendants' revenues from these sources, a similar scenario cannot be conjured with respect to revenues whose levels were fixed and immutable before licensees had an opportunity to stock their shelves with logo-bearing goods. No rational trier of fact could find that the infringing Flying B logo enabled the defendants to generate more income from these two sources than they would otherwise have done. Because no portion of the Defendants' gross revenues from minimum guarantee shortfalls and free merchandise could be attributable to the infringement of Bouchat's copyright, the court did not err in awarding summary judgment to the Defendants with respect to these two sub-categories of the Excluded Merchandise Revenues.

b.

Having concluded that summary judgment in favor of the Defendants was proper with respect to both the minimum guarantee shortfalls and the free merchandise, we turn now to the Non-Merchandise Revenues and the remaining sub-categories of the Excluded Merchandise Revenues (i.e., the revenues from trading cards, video games, and game programs). Our inquiry on this point is whether, despite the existence of a conceivable connection between the infringement and the level of revenue that the Defendants earned from these sources, the court was correct in excluding them through summary judgment. Because Bouchat offered only speculative evidence of a causal link between the infringement and the level of the revenues that the Defendants earned from these sources, and because the Defendants' request for summary judgment was supported by unrebutted evidence demonstrating that these revenues were not, in fact, in any way attributable to the infringement, there was no issue of material fact for consideration by the jury. As a result, the court did not err in awarding summary judgment to the Defendants with respect to these remaining categories of revenue.

When they moved for summary judgment, the Defendants successfully carried their initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. In support of their initial motion for summary judgment, the Defendants proffered affidavits showing that Non-Merchandise Revenues are driven by business and consumer interest in NFL football, and are in

no way responsive to logo design. *See* J.A. 73-104. In support of their subsequent summary judgment motion, the Defendants again proffered numerous affidavits, this time showing that sales of trading cards, video games, and game programs are driven by consumer interest in NFL football, and likewise are in no way responsive to logo design. *See* J.A. 371-88; *see also* July Order at 2 nn.4-6. The supporting affidavits established beyond reasonable debate that neither any portion of the Defendants' Non-Merchandise Revenues, nor any portion of their revenues from trading cards, video games, or game programs, was attributable to the Defendants' selection and use of the infringing Flying B rather than some other logo.

Having met their initial burden, the Defendants successfully shifted the onus onto Bouchat to come forward and demonstrate that such an issue does, in fact, exist. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (holding that, once motion for summary judgment is properly made and supported, opposing party has burden of showing, by means of affidavits or other verified evidence, that there exists genuine dispute of material fact); *see also Mackie*, 296 F.3d at 911 (holding that "to survive summary judgment, a copyright infringement plaintiff seeking to recover [attenuated] profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement," and that, should plaintiff "fail[ ] to adduce any non-speculative evidence that would even suggest a link between the infringement and the [defendant's] supposedly enhanced revenues," then summary judgment in favor of defendant with respect to those revenues is proper). Bouchat, however, produced no specific facts showing that there was a genuine issue for trial; in fact, he declined to respond to the summary judgment motions with any evidence at all, resting instead on his initial, and sole, evidentiary proffer: the total receipts generated by all NFLP and Ravens activities.[10]

---

[10]That Bouchat failed to respond is, indeed, unsurprising, in light of the fact that the affidavits merely confirm what ordinary experience would

Because Bouchat failed to offer any nonspeculative evidence demonstrating the existence of a genuine dispute of material fact, the court appropriately awarded summary judgment to the Defendants on the ground that the Non-Merchandise Revenues and the revenues from trading cards, video games, and game programs could not reasonably be found attributable to the infringement.

In sum, the Defendants established in their motions for summary judgment that there existed no causal link between their adoption of the infringing Flying B logo and either the Defendants' Non-Merchandise Revenues or their revenues from trading cards, video games, or game programs. In response, Bouchat rested on his speculation that somehow, somewhere, some part of the Defendants' revenues from these sources was influenced by the fact that the Defendants selected the Flying B rather than some other logo. However, because "[u]nsupported speculation is not sufficient to defeat a summary judgment motion," *Felty*, 818 F.2d at 1128, the court properly awarded summary judgment to the Defendants both with respect to the Non-Merchandise Revenues and with respect to the revenues from sales of trading cards, video games, and game programs.

c.

It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted); *see Celotex Corp.*, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). Once the Defendants had carried their initial burden of dem-

---

otherwise seem to render apparent: that no reasonable trier of fact could find that the sale of a ticket, or of a sponsorship, or of broadcast rights was in any way a consequence of the team's adoption of one logo design rather than another. Similarly, it defies credulity that a consumer would purchase NFL trading cards in order to catch a glimpse of the Flying B logo on a featured player's helmet; or video games, so as to see the logo on the simulated Ravens players; or a game program, simply because its artwork incorporated the Flying B. *See* J.A. 475-80.

onstrating the absence of any genuine issue of material fact regarding the attributability of the contested revenues, Bouchat could survive the motion for summary judgment only by adducing specific, non-speculative evidence supporting the existence of a link between the infringement and the Defendants' supposedly enhanced revenues. Because Bouchat failed to make such a showing, the court properly awarded summary judgment to the Defendants.

### B.

Finally, Bouchat contends that the district court, in its instructions to the jury, failed to accord him the full benefit of the statutory presumption contained in § 504(b).[11] Specifically, Bouchat maintains that the court abused its discretion by failing to make clear to the jury that the Ravens bore the burden of proof in the damages trial. To the contrary, the court made it eminently clear in its instructions that the Ravens were obliged to shoulder the burden of proof. *See, e.g.*, J.A. 563-65 (stating to jury, at the outset of trial, that "[i]n this case, the burden of proof is on the *defendants* to prove the extent to which the revenue derived from the sale of these products is attributable to factors other than the art work of the Flying B logo. . . . Question one [of the Verdict form] asks, have *defendants* proven by a preponderance of the evidence that income derived by defendants from the sale of products bearing the Flying B logo was attributable completely to factors other than the art work of the Flying B logo."(emphasis added)); J.A. 903 (instructing jury immediately prior to deliberations that "[t]he case is about whether on the evidence the defendants . . . have carried their burden of proof . . . . On those questions the *defendants* have the burden of proof by a preponderance of the evidence." (emphasis added)).

This burden of proof point was further emphasized by the first

---

[11]We review a trial court's jury instructions for abuse of discretion. *See Walker v. Forbes, Inc.*, 28 F.3d 409, 414 (4th Cir. 1994). It is well settled that a "district judge has broad discretion in framing his jury instructions." *Merlo v. United Way of America*, 43 F.3d 96, 103 (4th Cir. 1994). Thus, instructions do not furnish grounds for reversal of an adverse verdict so long as, taken as a whole, they "adequately state the controlling law." *Eberhardt v. Integrated Design & Construction Incorporated*, 167 F.3d 861, 869 (4th Cir. 1999).

question on the Verdict form tendered to the jury by the court, reading "Have the *Defendants* proven by a preponderance of the evidence that income derived by the Defendants from the sale of products bearing the Flying B logo was attributable completely to factors other than the art work of the Flying B logo?" J.A. 564-65 (emphasis added). Viewed in context, the instructions plainly informed the jury of the controlling legal principles; the court therefore did not abuse its discretion.[12]

## IV.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent. I am of opinion that the district court erred by refusing to instruct the jury that the defendants' profits are deemed attributable to the alleged copyright infringement unless the defendants prove otherwise.

I first recount some of the relevant facts from our earlier opinion in this case. In 1995, Frederick Bouchat was a security guard at an office building. As word spread that a National Football League team was returning to Baltimore, Bouchat drew team designs and logos. He showed the designs to visitors of the building and sometimes gave them away as gifts. *Bouchat v. Baltimore Ravens, Inc.*, 228 F.3d 489, 491-92 (4th Cir. 2000).

After seeing some of Bouchat's designs, a state official who worked in the building arranged a meeting between Bouchat and John

---

[12]Bouchat also raises several additional challenges to the district court's handling of the damages trial, focusing in particular on other aspects of the instructions and on the court's evidentiary rulings. On careful review, we are unable to discern any abuse of discretion on these issues, and our affirmance of the court on these contentions does not warrant further discussion.

Moag, the chairman of the Maryland Stadium Authority. Moag is credited with bringing the Ravens team to Baltimore. After Bouchat described his drawings, Moag told Bouchat to send him the drawings so that he could pass them along to the Ravens for consideration. Bouchat got permission from his supervisor to use the office fax machine and faxed his drawing to the Maryland Stadium Authority. Within a day after Bouchat sent his fax, Moag met with National Football League Properties officials to discuss the design of the new Ravens logo. The Ravens unveiled their new logo several months later. Bouchat and his co-workers immediately recognized the new logo as Bouchat's work. Bouchat successfully sued the defendants for copyright infringement. *Bouchat*, 228 F.3d at 491-92. The district court bifurcated that first trial. After a trial on the issue of liability, the jury found that the defendants infringed Bouchat's copyright and this court affirmed. *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350 (4th Cir. 2001). Bouchat then sought damages under 17 U.S.C. § 504(b) in a separate jury trial that is the subject of this appeal.[1]

At the close of evidence in the damages trial, Bouchat asked the district court to give the jury instruction approved by this court in *Walker v. Forbes*, 28 F.3d 409 (4th Cir. 1994). In *Walker*, we affirmed the district court's instruction on the award of profits in a copyright infringement case.[2] Bouchat asked for the instruction by name and also read the relevant language into the record.

---

[1]As the majority points out, Bouchat could not elect to receive statutory damages because he had not registered his copyright at the time of the infringement.

The majority also notes that Bouchat did not claim any actual damages. This is understandable. Bouchat drew his proposed logos for the Ravens in his spare time and often gave them away as gifts. He submitted his design to Moag only after Moag suggested it. Even then, he asked in return only for "a letter of recognition" and an autographed helmet, "if the team wants to." Thus, it is likely that Bouchat's actual damages, if any, were nominal. Regardless of his actual damages, however, Bouchat is entitled to defendants' profits attributable to the infringement because the award of profits is intended to "prevent the infringer from unfairly benefitting from a wrongful act" and not to compensate the copyright owner. H.R. Rep. No. 94-1476, at 161 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5777.

[2]This court not only affirmed the use of the instruction, but also praised it, noting that "the district court's rich and detailed instructions

The district court declined to give the *Walker* instruction. Instead, the court read from the jury verdict form. Although the district court explained that "the defendants have the burden of proof by a preponderance of the evidence," the court never instructed the jury that they must presume all profits are attributable to the infringement unless the defendants prove otherwise.

I agree with the majority's conclusion that the district court correctly instructed the jury on the burden of proof. Under *Walker*, however, merely stating that the defendant bears the burden of proof is not enough. The *Walker* instruction also informs the jury that profits should be deemed attributable to the alleged infringement unless the defendant proves otherwise. *Walker*, 28 F.3d 414. Indeed, our opinion emphasized the following portion of the district court's instruction: "*amounts or elements of profits should be deemed attributable to the alleged infringement unless [the defendant] proves by a preponderance of the evidence that they are not.*" *Walker*, 28 F.3d at 414 (emphasis in original). The importance of this portion of the instruction is evident from our analysis following the emphasized language:

> This instruction correctly stated the law concerning the shifted burden of proof that the defendant bears to show the portion of revenues and profits that are not attributable to the infringement, and, *in the emphasized language, explained the impact of this shifted burden upon the apportionment calculation.*

*Walker*, 28 F.3d at 414 (emphasis added). The emphasized language in *Walker* is the basic thought around which the decision is based, and its conscious omission here is, I think, reversible error.

Later cases in this circuit recognize that § 504(b) creates a presumption in favor of the copyright holder on the issue of profits. In *Nelson-Salabes, Inc. v. Morningside Development*, 284 F.3d 505 (4th

did an excellent job of explaining to the jury its task in determining the correct apportionment of profit attributable to the infringement, faithfully explaining the rules and procedures set out in the statute." *Walker*, 28 F.3d at 416.

Cir. 2002), this court acknowledged that "under § 504(b), all gross revenue is presumed to be profit 'attributable to the infringement' unless the infringer is able to demonstrate otherwise." *Nelson-Salabes*, 284 F.3d at 512 n.9.

Other courts similarly acknowledge that § 504(b) creates a presumption in favor of the copyright owner. In *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1173 (1st Cir. 1994), the First Circuit held that "the plaintiff must meet only a minimal burden of proof in order to trigger a rebuttable presumption that the defendant's revenues are entirely attributable to the infringement." The rebuttable presumption language in *Data General* has been used by a number of district courts. See *Andreas v. Volkswagen of America, Inc.*, 172 F. Supp.2d 1168, 1170 (N.D. Iowa 2001); *Bruce v. Weekly World News, Inc.*, 150 F. Supp.2d 313, 315 (D. Mass. 2001), *rev'd on other grounds*, 310 F.3d 25 (1st Cir. 2002); *Rainey v. Wayne State University*, 26 F. Supp.2d 963, 971-72 (E.D. Mich. 1998).

In addition to refusing to give the *Walker* instruction, the district court limited its instructions on the award of profits under § 504(b) to an explanation of the special verdict form. The court read each question from the verdict form and then gave a brief explanation of what the question meant. The first question asked "have the defendants proven by a preponderance of the evidence that income derived by the defendants from the sale of products bearing the Flying B logo was attributable completely to factors other than the artwork of the Flying B logo." The jury answered "yes" to question one and ended their deliberations.

The verdict form and accompanying instructions used in this case are troubling. Special verdict forms "should be resorted to with discrimination and foresight" *Morris v. Pennsylvania R. Co.*, 187 F.2d 837, 841 (2d Cir. 1951). Indeed, Justice Black and Justice Douglas wrote that special verdict forms can be, as here, "used to impair or wholly take away the power of a jury to render a general verdict." Statement of Mr. Justice Black and Mr. Justice Douglas on the Rules of Civil Procedure and the Proposed Amendments, 31 F.R.D. 617, 618 (1963).

In this case, the lack of a clear, or any, instruction relating to the presumption of award of profits, together with the limited scope of the verdict form questions, can only have discouraged the jury from awarding damages to the plaintiff, even if the facts and the law supported such an award. This result runs counter to the fundamental purposes of trial by jury.[3] See 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2503 (2d ed. 1994).

In sum, given our holding in *Walker* and the reasoning of later cases, I am of opinion that the jury should have been instructed that defendants' profits are deemed attributable to the infringement unless the defendants prove otherwise by a preponderance of the evidence. Accordingly, I would hold that the district court's instructions to the jury, taken as a whole, did not adequately state the controlling law. In my opinion, the failure of the district court, upon request, to give the instruction on the presumption of damages for the plaintiff, which was literally approved in *Walker*, was an abuse of discretion even if subject to discretionary consideration. It cut the heart out of the plaintiff's case. For that reason, I would reverse and remand for a new trial.

---

[3]Some of the greatest legal thinkers in American jurisprudence have written on the importance of leaving juries free to decide cases so that they may apply not only the law, but also their own sense of justice. See e.g., Oliver Wendell Holmes, *Law in Science and Science in Law*, in *Collected Legal Papers* 237-238 (1920); Roscoe Pound, *Law in Books and Law in Action*, 44 Am. L. Rev. 12, 18-19 (1910); John H. Wigmore, *A Program for the Trial of Jury Trial*, 12 J. Am. Jud. Soc. 166, 170 (1929); Roger J. Traynor, *Fact Skepticism and the Judicial Process*, 106 U. Pa. L. Rev. 635, 640 (1958); Charles E. Wyzanski, Jr., *A Trial Judge's Freedom and Responsibility*, 65 Harv. L. Rev. 1281, 1286 (1952).