Jerry **TRULL;** Don Henson; Floyd Sutton; Earl Johnson; Roderick Rogers; and Joyce Riggs, Individually and as Representative of a class of all persons similarly situated, Plaintiffs,

v.

**DAYCO PRODUCTS, LLC;** Mark IV Industries, Inc.; Dayco Products, Inc. Medical Plan; and Mark IV Industries, Inc. and Subsidiaries Group Welfare Benefit Program, Defendants.

No.  CIV. 1:02CV243.

United States District Court,
W.D. North Carolina,
Asheville Division.

May 28, 2004.

C. Frank Goldsmith, Jr., Goldsmith & Goldsmith, Marion, NC, Robert Alexander, Julia Penny Clark, Michael H. Sampson, Page Kennedy, Maryann Parker, Bredhoff & Kaiser, PLLC, Washington, DC, James B. Robinson, Thomas J. Kircher, Kircher Robinson Newman & Welch, Cincinnati, OH, for Plaintiffs.

L. Neal Ellis, Jr., Hunton & Williams, Raleigh, NC, John W. Allen, Joseph J. Vogan, David E. Khorey, Anthony R. Comden, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, Wood W. Lay, Hunton & Williams, Charlotte, NC, Andrew Charles Storar, Pickrel Schaeffer & Ebeling, Dayton, OH, for Defendants.

### *MEMORANDUM AND ORDER*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the following motions:

1. Mark IV's motion for oral argument and reply briefing, filed January 30, 2004;

2. the collective motion of all Defendants for summary judgment as to Subclass A, the pre–1995 retired employees, filed January 30, 2004;

3. the Defendants' motion for leave to file a supplemental reply, filed March 26, 2004; and

4. the parties' stipulation of dismissal of allegations that the Defendants improperly calculated the costs of medical coverage, filed May 12, 2004.

The Defendants' request for oral argument and for leave to file a supplemental reply are denied. The Court notes with displeasure that the Defendants filed three separate motions for summary judgment instead of combining all issues in one motion, apparently in an effort to defeat the page limit for briefs. Defense counsel are cautioned against such conduct in the future.

## I. PROCEDURAL BACKGROUND

On December 21, 2001, the Plaintiffs filed this action in the United States District Court for the Southern District of Ohio. On September 20, 2002, that Court transferred venue to this District. Plaintiffs alleged in the complaint that the action was brought "to enforce the terms of certain Group Benefits Agreements entered into between Dayco [Products, LLC] and Local No. 277, United Rubber, Cork, Linoleum and Plastic Workers of America ('Local 277') and to enforce both Section 502(a)(1) and (3) of the Employee Retirement Income Security Act of 1974, as amended ('ERISA'), 29 U.S.C. § 1132(a)(1), (3), and Section 301 of the Labor Management Relations Act of 1947, as amended ('LMRA'), 29 U.S.C. § 185." [1] Second Amended Complaint, filed January 6, 2004, at 1–2. At issue is the provision of medical benefits for retired employees of Dayco who were members of Local 277 at Dayco's Waynesville, North Carolina, plant. That plant closed all operations in 1998. On May 2, 2003, the undersigned certified this action as a class action.

1. Dayco Products, LLC, is the successor corporation to Dayco Products, Inc., by virtue of a corporate reorganization which occurred in July 2001. Second Amended Complaint, at 4. The Waynesville plant was operated by Dayco

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra*).

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judg-

Products, Inc., and is referenced herein as "Dayco." Dayco Products, LLC, is a wholly owned subsidiary of Mark IV Industries, Inc. (Mark IV). *Id.*

ment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered." *Bouchat,* at 522 (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987)) (other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. FINDINGS OF FACT

At issue in this case is whether and to what extent medical benefits were to be provided to employees who retired from Dayco pursuant to collective bargaining agreements entered into between Local 277 and the company. The first such agreement, the "Dayco Southern (1964) Insurance Agreement," contained the following provision concerning retired employees:

> Employees who have been retired under the Pension Plan and who are entitled to pension benefits thereunder shall continue to receive coverage for life insurance[.] The Company will provide hospitalization and in-hospital medical and surgical coverage *for employees hereafter retiring* and receiving retirement benefits under the Company's Pension Plan *and their dependents until the death of the retired employee,* to be reduced, however, to the extent of any benefits hereafter becoming available under any Federal Social Security or other Federal medicare plan which the retired employee or his dependent would be eligible to receive.

Exhibit 1, *included in* Appendix to Brief in Support of Defendants' Motion for Summary Judgment as to Pre–1995 Retirees (Subclass A) ["Defendants' Appendix"], filed January 30, 2004, at MIV006456 (emphasis added). The Agreement also provided that it would remain "in force" through April 1968 at which time it would "automatically renew itself for annual periods thereafter unless notice of termination is given" within a certain period prior to expiration. *Id.,* at MIV006459.

Another "Insurance Agreement" was entered into between Dayco and Local 277 effective April 2, 1968. Exhibit 2, *included in* Defendants' Appendix, at MIV005185. Section C of that Agreement provided hospital, surgical, and medical benefits for employees and their dependents "for the duration of this Agreement." *Id.,* at MIV005188. Included in the section captioned "Eligibility for Insurance" were the following provisions:

> Employees who retire and who are eligible under the Pension Plan for a pension (other than a deferred vested pension) and employees 65 years of age who are eligible for a Severance Award, *shall receive the benefits described in this Section C*[.] ... *To the extent that such employees are covered hereby only those dependents at the time of the employee's retirement shall be covered by this provision. The surviving spouse of [ ] a deceased employee who retires on or after April 2, 1968, and was eligible for a pension ... shall be entitled to continue to receive the benefits of this Section C until death or remarriage* to the extent that such surviving spouse was entitled to such benefits as a dependent immediately prior to the death of such deceased former employee.

*Id.,* at MIV005195 (emphasis added). This Agreement was to remain "in force

through April 1, 1971" and, like the 1964 Agreement, would "automatically renew itself for annual periods thereafter" unless notice of termination was provided within a certain period of time. *Id.*, at MIV005197. In addition, as was provided in the 1964 Agreement, if notice of termination of the Insurance Agreement was provided, either party had the right to also terminate the collective bargaining agreement "pertaining to rates of pay, hours of work, wages and other conditions of employment[.]" *Id.*

> In the event said collective bargaining agreement between the parties is terminated, as hereinabove provided, and thereafter negotiations on the question of insurance benefits covered by this Agreement are satisfactorily concluded between the parties, *the collective bargaining agreement* shall again be in full force and effect. Notwithstanding the termination of said Agreement in accordance with its terms, *the benefit programs provided for therein shall be continued for a period of ninety (90) calendar days following such termination.*

*Id.* (emphasis added). The same provision had been extant in the 1964 Agreement. The 1971 Agreement provided that "[t]he Company will provide the following . . . hospitalization, diagnostic x-rays, in-hospital medical and surgical benefits, *without cost to the employees*[.]" Exhibit 3, *included in* Defendants' Appendix, at MIV001654 (emphasis added). The same language had been included in both the 1964 and 1968 Agreements. The 1971 Agreement contained the identical language concerning the health insurance benefits for retirees and their dependents/surviving spouses. However, for the first time, the Agreement contained a provision for prescription drug benefits "[e]ffective April 2, *1973*" for "all employees *actively* at work[.]" *Id.*, at MIV001668

(emphasis added). No provision was made for drug benefits for retired employees. The Agreement also contained the identical language in the 1968 Agreement concerning duration, renewal, termination and the collective bargaining agreement. *Id.*, at MIV001671–72.

The next Agreement was captioned "Employee Benefits Agreement," instead of "Insurance Agreement," and became effective April 29, 1974. Exhibit 4, *included in* Defendants' Appendix, at MIV001612. However, it contained the identical language of the 1971 agreement as to the benefits being "without cost to the employees," retiree, dependent, and spousal benefits, duration, renewal, termination and the collective bargaining agreement. *Id.*, at MIV001613, 1616, 1624, 1625–26. In this Agreement, for the first time, prescription drug benefits were provided to "employees retiring on and after April 29, 1974[.]" *Id.*, at MIV001630.

A copy of the "Pension Contract," a separate contract with the employees, appears with the 1974 "Employee Benefits Agreement." *Id.*, at MIV001634. The Contract provided that any monthly pension payment payable to any employee under the contract would be reduced by "[a]ny payments under any insurance plan maintained by the Company." *Id.*, at MIV001639. However, the contract for the provision of medical benefits executed in 1974 was for the first time entitled "Employee Benefits Agreement," instead of "Insurance Agreement."

The next "Employee Benefits Agreement" became effective January 6, 1977, and contained identical language to the 1974 Agreement. Exhibit 5, *included in* Defendants' Appendix, at MIV005222–23 ("without cost to the employees"); MIV005227 ("for the duration of this Agreement"); MIV005237–38 ("Employees

who retire and who are eligible under the Pension Plan for a pension (other than a deferred vested pension) and employees 65 years of age who are eligible for a Severance Award, *shall receive the benefits described in this Section C[.] . . . To the extent that such employees are protected hereby, only those dependents at the time of the employee's retirement shall be protected by this provision. The surviving spouse of [ ] a deceased employee who has retired on or after April 29, 1974, and was eligible for a pension . . . shall be entitled to continue to receive the benefits of this Section C until death or remarriage* to the extent that such surviving spouse was entitled to such benefits as a dependent immediately prior to the death of such deceased former employee." (emphasis added)); MIV005242 (prescription drug benefits); MIV005252–53 (renewal, duration and termination).

Likewise, the language in the 1980 "Employee Benefits Agreement" is identical. Exhibit 6, *included in* Defendants' Appendix, at MIV005257, 5260 ("without cost to the employees"), MIV005265 (duration), MIV005273–75 ("Employees who retire and who are eligible under the Pension Plan for a pension (other than a deferred vested pension) and employees 65 years of age who are eligible for a Severance Award, *shall receive the benefits described in this Section C[.] . . . To the extent that such employees are protected hereby, only those dependents at the time of the employee's retirement shall be protected by this provision. The surviving spouse of [ ] a deceased employee who has retired on or after April 29, 1974, and was eligible for a pension . . . shall be entitled to continue to receive the benefits of this Section C until death or remarriage* to the extent that such surviving spouse was entitled to such benefits as a dependent immediately prior to the death of such deceased former employee."); MIV005280 (prescription drug

benefits); MIV005290–94 (renewal, duration and termination).

The "Employee Benefits Agreement" effective January 1, 1985, for the first time contained the provision, "[t]he Company will provide . . . hospitalization, diagnostic x-rays, in-hospital medical and surgical benefits, to be effective on the dates set forth below" in lieu of the phrase "without cost to the employees." Exhibit 7, *included in* Defendants' Appendix, at MIV005298. The Agreement contains the following provision for hospital, surgical and medical benefits for employees and their dependents:

> Effective January 1, 1985, and for the duration of this Agreement thereafter, the employer will provide the following plan of hospital expense benefits, hospital-medical benefits and surgical benefits . . .:
>
>> Effective with this agreement the company/employee will share in the cost of the benefits outlined on a 90/10 basis except that outpatient surgical procedures will be paid at 100% when performed in a qualified surgi-center approved by the company in instances where such coverage is economically beneficial to both the employee and the company.

*Id.,* at MIV005303. As for retired employees, the Agreement provides that

> At age 65 employees who are eligible for a . . . pension . . . shall receive the benefits described under the hospital/medical plan. . . . *To the extent that such employees are protected hereby, only those dependents at the time of the employee's retirement shall be protected by this provision. The surviving spouse of [ ] a deceased employee who has retired . . . and was eligible for a pension . . . shall be entitled to continue to receive the benefits of this hospital/medical plan*

*until death or remarriage* to the extent that such surviving spouse was entitled to such benefits as a dependent immediately prior to the death of such deceased former employee.

*Id.*, at MIV005313–14 (emphasis added). The Agreement did not contain any change to the language concerning prescription drug benefits. *Id.*, at MIV005319.

For the first time in the 1985 agreement, the Company allowed employees selecting early retirement to participate in a major medical plan.

> Effective April 5, 1979, the Company will provide a new Major Medical Plan for active Employees and their dependents.... Employees (and their dependents) retiring on or after January 1, 1985 *under the early retirement clause in the pension agreement* shall receive benefits under this Major Medical Plan until such time as the retiree becomes eligible for Medicare or dies, whichever occurs first.

*Id.*, at MIV005320. The Agreement contained identical language, however, as to duration, renewal, termination and continuation of benefits. *Id.*, at MIV005329–33.

The "Employee Benefits Agreement" effective May 26, 1990, was, for the purposes of this action, virtually identical to the 1985 Agreement. Exhibit 8, *included in* Defendants' Appendix, at MIV005337, 5341, 5361. However, the Agreement contained a special provision for employees retiring after May 2, 1994, pursuant to which $30 per month would be deducted from the retiree's pension check for medical coverage. *Id.* The Agreement contained a new provision for prescription drug benefits.

> Effective May 26, 1990, ... employees retiring after May 26, 1990, who were hired prior to May 2, 1990, will be covered under the Prescription Drug Benefits. Employees hired after May 26, 1990 are not covered under this pre-

scription drug benefit. Employees who retired between April 29, 1974 and May 2, 1990 will be covered by the drug program, but the co-pay shall be $1.00.

*Id.*, at MIV005366–67. Unlike the previous agreements, the 1990 Agreement did not contain the following sentence after the provision for reinstatement of the agreement upon new negotiations: "Notwithstanding the termination of said Agreement in accordance with its terms, the benefit programs provided for therein shall be continued for a period of ninety (90) calendar days following such termination." *Id.*, at Bates No. MIV005372.

The May 1, 1995 Agreement was captioned "Group Benefits Program" and contained the following provisions:

## COVERAGE WHEN YOU RETIRE

> When you retire from active service with the Company, your benefits are administered as follows:

> .    .    .    .    .

> If you meet the eligibility for early, normal, or disability retirement under the Company's qualified pension plan and retire from active service, *you may continue your coverage as a retiree under the Medical Plan.... Provided that the cost of coverage under the Plan does not exceed $3,500 for pre-Medicare retirees or $1,900 for Medicare-eligible retirees, there will be no cost to you for coverage under the Medical Plan as a retiree. When you retire, you may also maintain coverage for your eligible dependents, provided they were eligible dependents at the time of your retirement.*

> .    .    .    .    .

> The surviving spouse of [ ] a deceased employee who has retired on or after April 29, 1974 and was eligible for a pension ... shall be entitled to continue to receive the benefits of this medical

plan until death or remarriage to the extent that such surviving spouse was entitled to such benefits as a dependent . . . .

.    .    .    .    .

The Agreement as it relates to Employee Benefits shall remain in force through May 1, 2000, *and will automatically renew itself for annual periods thereafter unless notice of termination is given* . . . . In the event said collective bargaining agreement between the parties is terminated, as hereinabove provided, and thereafter negotiations on the question of employee benefits covered by this Agreement are satisfactorily concluded between the parties, *the collective bargaining agreement shall again be in full force and effect.*

.    .    .    .    .

The Company and the Union agree to the following:

> Any agreed to language in this agreement which might have been inadvertently omitted or changed from the 1990 SPD [summary plan description] because of a change in format, and *which can be mutually verified by both parties by reference to the Tentative Agreement signed on March 28, 1995, will be considered as agreed to and applicable language for this existing agreement.*

Exhibit 9, *attached to* Plaintiffs' Response to Defendants' Motions for Summary Judgment ["Plaintiffs' Response"], filed February 20, 2004, at MIV000067, 69–70, 74–75, 86–87, 99.

The Tentative Agreement referenced in the 1995 Agreement contained language that would "[d]elete the provision requiring future retirees (retiring after May 2, 1995) to pay $30 per month of medical premium." Exhibit 4, *attached to* Appendix to Brief in Support of Defendants'

Motion for Summary Judgment as to Post–1995 Retirees (Subclass B), filed January 30, 2004, at MIV000483. It also contained the following:

4. "FSAB"

> Effective May 1, 1995 those employees retiring during the term of this agreement shall be subject to a post retirement medical annual cost cap of $3500/pre–65 and $1900/post–65. Those employees selecting to retire within 90 days of May 1, 1995 shall be subject, if they so choose, to the pre-addendum agreement dated July 2, 1992.

.    .    .    .    .

18. Future Hires After May 1, 1995

.    .    .    .    .

> E. Future hires will not be eligible for retiree medical.

*Id.*, at MIV000485–86.

The pre-addendum agreement dated July 2, 1992, and referenced in the 1995 Tentative Agreement was in fact a "Memorandum of Agreement" entered into between the Union and the company which forestalled the closing of the Waynesville plant. Exhibit 26, Deposition of James Carver, *included in* Defendants' Appendix, at 63. Carver, the Union representative at the time, testified that, in essence, the Union "bought" their jobs by entering into the agreement. *Id.* "I want[ed] it in writing to show [the Union] membership this will insure you that you have a job, because these caps will be null and void if they close the plant." *Id.* The Agreement provided as follows:

> The Company and Union Negotiating Committee agree to adopt an addendum to the existing contract, which shall incorporate the following:
>
> 1. A $2,800 annual cap for eligible individuals who retire and are under age 65.

2. A $1,300 annual cap for eligible individuals who retire and are 65 years of age or older.

3. A guarantee that no individual will be affected by the cap prior to July 2, 1995.

4. *A guarantee that this memorandum does not apply if the plant is closed.*

5. An option for employees eligible to retire under the existing labor agreement to retire any time during this contract, or within the first 90 days of the effective date of the next contract, and to elect that their benefits be treated identically to the pre-addendum retirees.

6. Recognition that the establishment of caps for future retirees is a proper subject for collective bargaining.

Exhibit 13, *included in* Defendants' Appendix, at MIV000101 (emphasis added).

The 1995 Pension Plan contained the following provision:

It is anticipated that the Master [Pension] Plan will remain in effect indefinitely. However, as is customary with retirement plans of this type, *the right to amend, modify or terminate the Master Plan in full or in part at any time must be reserved by the Company and Mark IV provided that no amendment may reduce or eliminate benefits already accrued.* If the Master Plan is ever terminated, the assets held by the trustee must be used on behalf of the participants as described in the Plan.

Defendants' Appendix Exhibit 9, *supra,* at MIV005864.

On December 16, 1992, Don Bethune, Dayco's president at the time, sent a letter to Dayco retirees advising that the annual premium cost for medical insurance per retiree was $1,347 for Medicare eligible retirees and $2,354 for non-Medicare eligible retirees. Exhibit 15, *included in* Defendants' Appendix, at MIV000240. The same cost was assessed for the retirees' dependants. *Id.* The letter also advised that effective March 1, 1993, the company would not pay more than $2,000 per year for a Medicare eligible retiree and his or her dependent or more than $3,250 per year for a non-Medicare eligible retiree and his or her dependent. *Id.*

This letter was swiftly met with opposition from the Union. Bob Long, the Director of Pensions, Insurance and URW[2] Employee Benefits, wrote to the president of Local 277 on January 5, 1993, advising that in his opinion, "the capping of retiree health care benefit premiums constitutes a direct violation of Part I, Paragraph E. (8)(c), (Page 28), of the ... May 26, 1990 Employee Benefits Agreement. Only employees retiring after May 2, 1994 are to be required to pay a portion of the health care benefit premium ($30 per month)." Exhibit 16, *included in* Defendants' Appendix, at 00023. On January 13, 1993, Charles Armstrong, general counsel for the Union, wrote to Bethune to explain that "the URW will vigorously resist any attempt to treat retirees in a manner which is inconsistent with the term[s] of the collective bargaining agreement." Exhibit 17, *included in* Defendants' Appendix, at MIV001225.

A letter similar to the December 16, 1992, letter was sent by Dayco to retirees on February 16, 1994; but, as with the December 1992 letter, the cost of premiums per retiree had not yet exceeded the caps imposed by Dayco. Exhibits 19, 20, 21, *included in* Defendants' Appendix, at JT00593–597.

On January 14, 1997, the company and the Union entered into an "Effects Bar-

2. United Rubber Workers.

gaining Agreement" in view the imminent closing of the Waynesville Dayco plant. Exhibit 22, *included in* Defendants' Appendix.

> By ratifying this Effects Bargaining Agreement and accepting its provisions herein all employees do hereby agree to waive all claims against the company, present and future, as a result of the March 31, 1998 termination of the Collective Bargaining Agreement, Effects Bargaining Agreement, Pension Agreement, Benefits Agreement, SUB Agreement, FASB and *etc.* It is further agreed to by the parties that there will be no potential litigation as the result of this provision. The only exception to this provision shall be the company's failure to honor any and all terms of the Effect Bargaining Agreement or any applicable benefit plan that continues past the contract termination. *The parties expressly agree that nothing in this agreement is intended to waive, modify or limit any retiree's right to a pension or medical insurance, nor is it intended to waive, modify or limit such rights for any employee who is eligible to retire pursuant to the terms of the amended agreement.*

> .    .    .    .    .

> Any employee previously retired from Dayco who was eligible for retiree medical coverage at the time of retirement, and who is presently covered as the spouse of an active Dayco employee shall be given a one time opportunity at the beginning of the employee's stay payment period to enroll in Dayco's present retiree medical program and election of appropriate coverage.

> .    .    .    .    .

> The established FASB retiree medical caps negotiated and agreed to during the 1995 collective bargaining negotia-

tion are not altered by this Effects Bargaining Agreement.

*Id.,* at MIV000247–48, 252–53, 255 (emphasis added).

In January 1999, Mark IV sent a summary plan description of the health benefits to those employees who had retired prior to January 1, 1985. Exhibit 11, *included in* Defendants' Appendix, at MIV000106. In this document, which post-dates the employee benefits plan itself, Dayco represented that it "offers this plan to eligible retirees, *but necessarily reserves the right to amend, change or terminate the Plan or coverage, or adjust retiree contribution requirements at any time." Id.* (emphasis added).

> The Company reserves the right to amend the Plan at any time and from time to time. If an amendment significantly changes the provision of the Plan outlined in this summary plan description, a new summary plan description or supplement will be furnished to participants. Although the Company *intends to continue this Plan on a permanent basis,* it also reserves the right to terminate the Plan. If the Plan is terminated, all claims incurred prior to the date of termination will be paid in accordance with regular Plan provisions.... Your dependents' coverage will terminate when your coverage ends .... *In the event of your death, your eligible dependents may elect to continue coverage as explained earlier under "Dependent Eligibility Upon Retiree's Death."*

*Id.,* at MIV000132. The same language appeared in the summary plan description sent in January 1999 to employees who retired between January 1, 1985, and May 26, 1990, and to employees who retired between May 26, 1990, and May 1, 1995. *Id.,* at MIV000144, 173, 185, 211.

Charles Armstrong, the Union's attorney, testified that the union traditionally

668

did not bargain with the company about retired employees. Deposition of Charles Armstrong, *attached to* Plaintiffs' Response, at 128. "[R]etirement benefits are essentially status benefits, which means once you've retired, there's never going to be bargaining on it again." *Id.*, at 130.

Carver testified that the Local 277 typically sent notice of termination during the necessary window period in order to open negotiations for a new collective bargaining agreement prior to expiration of the existing one. Carver Deposition, *supra,* at 33–37. The Union always took the position that any benefits it already had in place under the old benefits agreement were to remain; the only negotiation regarded new or additional benefits. *Id.* "We always negotiated for active employees. We were not allowed, or refused to bargain for retirees." *Id.*, at 37. However, this did not mean that negotiations never took place to improve benefits for retirees; it only meant that the Union could not strike over an issue involving retirees. *Id.*, at 144–45. Retirees typically did not attend the open meetings of the Union. *Id.*, at 47. Nor were retirees allowed by the Union to vote. *Id.*, at 48. Carver recalled one occasion when the Union and the company agreed by a "letter of intent" for the company to pay the medical costs of allergy serum for employees although the serum was not technically a drug under the health insurance plan. *Id.*, at 80–82. The letter of intent was used to amend the plan prior to the next contract at which time the provision for serum was added into the plan. *Id.* Dayco did not have a trust account pursuant to which it paid medical insurance benefits because it was self-insured. *Id.*, at 85. "It was common knowledge to everyone that ever worked at Dayco Waynesville that the benefits negotiated and at the date of retirement you would carry those for the remainder of your life at no cost to you."

*Id.*, at 100. As for the duration of collective bargaining agreements related to employee benefits, Carver testified that, "I've never taken an insurance agreement or a pension agreement, or any agreement as ever ending, just renewed." *Id.*, at 129. Although the benefits agreements themselves may have had a duration period, it was common knowledge that the benefits provided to retired employees did not expire with the agreement. *Id.*, at 173. The retirees were "[c]overed for life." *Id.* "[T]he intent between the parties was no less than full coverage from the date of retirement." *Id.*, at 175. Moreover, if a benefits agreement were subsequently amended to provide additional benefits, the company provided those benefits to all retired employees regardless of whether they had retired under previous agreements. *Id.*, at 185–87. This did not apply, however, when the company began to offer major medical coverage; that benefit only applied to employees retiring after the 1980 agreement went into effect. *Id.*, at 250–51. And, it was commonly understood by both the Union and the company that the company "couldn't reduce [retirees'] benefits because they were not eligible to vote on that reduction." *Id.*, at 188. "[W]e were reminded on numerous occasions that what a retiree had at the date of retirement would be for the remainder of his life, and that could not be altered by either party because the retiree was not an eligible voter at any ratification." *Id.*, at 192. In fact, during his experience as a union representative, in "the discussions that we have had over the years[,] the terminology ["]vesting["] was not ever used until the Pension Reform Act of 1977 come out and that pertained to pensions. It was always clearly understood a retiree at the date of retirement would retain the benefits at the time of retirement." *Id.*, at 280–81. And, during his tenure, Carver

could not recall a single incident during contract negotiations in which the company proposed reducing benefits for retirees. *Id.*, at 284–85. Moreover, at the time an employee retired, he or she was offered a retirement counseling session at Dayco during which the company representatives acknowledged that the medical benefits were for life.

Earl Johnson was also a union representative during the time at issue. When the benefits agreements provided for a duration, that duration was in reference to active employees and never to retired employees. Exhibit 30, Deposition of Earl Johnson, *included in* Defendants' Appendix, at 8–9, 46. When the benefits agreements were renegotiated, retirement benefits were not a subject of negotiation because "[i]f they retired under the 1985 retirement then that's the benefits they had." *Id.*, at 22. During the 1992 negotiation, the company never advised the Local 277 that the retiree benefits were not vested. *Id.*, at 77.

Stevenson Kerns was the vice president of human resources for Dayco during the time period at issue. Exhibit 31, Deposition of Stevenson Kerns, *included in* Defendants' Appendix, at 123–24. He was present during the collective bargaining negotiations in 1990, 1992 and 1995. *Id.*, at 125–26.

> [T]he management [salaried] people at Waynesville, in my opinion, operated under this guise that if the union got something that the company would make sure that the salary people got it, okay, in any way, shape or form. So often times, in making a decision and I would talk to the salary people about certain things, some of their comments I felt were slanted, if you would, because they felt very strongly that their situation would be impacted by what we chose to do with the union.

*Id.*, at 152–53. During some of these discussions with management, Kerns presented his opinion that the company had the right to make changes to retirees' benefits and management did not agree with him. *Id.*, at 154. In connection with the 1990 negotiations, one of the proposals which may have been presented to the Union was the concept of the retirees' benefits "floating" with those of active employees, *i.e.*, if changes were made for active employees, the same change would be made for retirees. Kerns Deposition, *attached to* Plaintiffs' Response, at 164. Kerns could not recall, however, whether that proposal was actually presented to the Union. *Id.* As to the 1992 Addendum, Kerns agreed with the Union that to the extent any employee had legal rights under the 1990 agreement, those rights would not be impacted by the 1992 Addendum if he retired within the 90–day period described therein. Defendants' Appendix Exhibit 31, Kerns Deposition, *supra*, at 213–14. Kerns also agreed that during the life of a benefits agreement, the company could not make any changes to benefits without agreement from the Union. *Id.*, at 218.

Beginning in 1988, Peter Kohler worked in the human resources department at the Waynesville Dayco plant. Deposition of Peter B. Kohler, *attached to* Plaintiffs' Response, at 6. During his tenure there, he participated in contract negotiations but it was always his understanding that the company did not have the right to bargain over benefits for employees who had already retired. Exhibit 32, Deposition of Peter B. Kohler, *included in* Defendants' Appendix, at 29. Kohler also recalled the "floating" proposal pursuant to which if an employee retired in 1992 under the 1990 agreement, his benefits would follow any future changes in the contract whether enhanced or decreased. *Id.*, at 33. Like Kerns, he could not recall if that proposal

was ever presented to the Union. *Id.* Kohler also recalled one occasion when it was proposed to the Union that future retirees would pay 50 percent of the cost of retiree benefits. Kohler Deposition, *supra,* at 40. "[T]hose were hot buttons to the union as far as they wouldn't talk about things such as that because people who had retired had retired under a contract had certain rights[.]" *Id.* "Again, I go back to that kind of general premise I worked under is a person's benefit is what they had[.]" *Id.,* at 41. The Union always took the position that they accepted the fact that their pension payments were low because they were counting on retiree medical benefits. *Id.* Kohler recalled a time when a letter was sent to retirees setting cost caps on health insurance benefits. *Id.,* at 85. This "caused a firestorm of concern amongst the retirees and, subsequently, the union." *Id.* As a result, a meeting was held which was heavily attended by retirees. *Id.,* at 88.

> [T]he general theme o[f] the meeting was to qualm the fears of retirees that they would have to pay for health insurance. That was just—I don't know the right word to explain how sacred the healthcare and the drug type thing was to the retirees. And so, the overall theme was to certainly answer the questions, but calm their fears of having to pay monies.

> Q. Did company representatives tell the retirees they would not have to pay premiums for their health insurance?

> A. I can't specifically remember a statement that said that, but that was—yes, that was the—the theme, that this was an accounting issue

more so than it was an issue of reality, I guess.

*Id.,* at 88–89.

> [A]nything that implied that out of pocket was going to go with retirees' health insurance or FAS[3] or the contract required a lot of emotion. And—and I remember we were—we as a company would continue to send out letters. I think we felt it was—was laying stake to what our position one day would be.

Defendants' Appendix Exhibit 32, at 92 (footnote added).

However, at the same time, the company consistently reassured the Union that "FASB was an accounting issue and not a negative impact out of pocket chase of your monies." *Id.,* at 93.

> Yeah, it goes back to I guess what I've been saying is the theme of this whole thing is that FASB 106 was an accounting issue. And we explained to the union that we had to put contractual language in place that would address, I think we would refer to it as the Wall Street issue side of it, that the liabilities would be capped in such a way that it would not adversely impact Mark IV's stock, ability to borrow money, those type of things that we said in the speeches. And the union would say that they understand that and that they were—I remember them saying over and over they were willing to do anything they could to help the company because that union understood without the company, they did not exist. Ergo, it was not a confrontational type relationship. They just wanted to make sure that there was not a trap door in what they were agreeing to in order to help the company accomplish their goal.

---

**3.** "In 1993, a change in financial accounting standards (FAS No. 106)" required certain disclosures and as a result, by " 'the end of 1994, almost half of the companies in the United States had modified retiree health benefits because of FAS 106.' " *Burks v. American Cast Iron Pipe Co.,* 212 F.3d 1333, 1335 n. 2 (11th Cir.2000).

Kohler Deposition, *supra,* at 102. Kohler understood, as the negotiator for the company during the 1995 negotiations, that employees who retired under the 1995 agreement would not be required to pay premiums of costs exceeding the cap. *Id.,* at 108. Both the Union and the negotiating team had a mutual understanding to that effect. *Id.*

Q. You said last time that it was your assumption that if a person retired with a benefit under a contract, that they would have that benefit forever?

A. That's correct.

Q. Was that assumption based on anything that you read in any of the insurance agreements?

A. I can't specifically point to a particular agreement that I would have read. But the answer is yes, based on the knowledge being of what I read, what I heard, what I discussed as part of the 1990 negotiations, it was my belief, and I think it was a general understanding, that whatever benefits you retired out with was your benefit for life.

Q. Was your assumption based on anything that was said during any of the negotiations in which you participated?

A. I can't again point to a specific time, but that was the general understanding. So one acquiesced to that as a fact, based on the general discussions in the negotiations.

Q. Do you recall any specific statement by any person during any of the negotiations which led you to believe that retiree health benefits were forever?

A. Yes.

*Id.,* at 158. This was so clearly understood by both the company and the Union that it was unnecessary to include it in writing in the contracts. *Id.,* at 162. Moreover, based on his experience as a human resources professional, there would not be an occasion when a company would provide benefits which had not been included in a contract, "especially the last 15 years, because of the cost of benefits[.]" *Id.,* at 174. Kohler testified that the company and the Union both agreed that the cost caps for health insurance premiums were "imaginary, and they were more of an accounting issue than they were of a real issue that could be imposed." *Id.,* at 227. This was done by the company in order "to get the Union to agree to the Memorandum of Understanding." *Id.* Kohler also knew why this was not specifically placed in writing in the Memorandum of Understanding.

It goes back to what I said earlier about just the general way that Waynesville company and union conducted business. They did not write a lot of specifics, but more just the general theme. It was always two things: One, everyone relied more on the understanding and the intent of a contract, more-so than they did on the written word. And, two, it was a practice there, as in many unions, that if you put too much detail into an agreement, it often stops ratification from the nay-sayers in the union.

*Id.,* at 227–28.

Michael McHaffey testified that while the word "vested" was never used in connection with the medical benefits, "the company, Dayco and Mark IV promised retirees health care benefits until they and their spouses passed away." Exhibit 33, Deposition of Michael Mehaffey, *included in* Defendants' Appendix, at 22.

William Russell was the attorney for the company during the time period at issue. It was the company's position "that as to people already retired that the union really

didn't have any standing to negotiate for them." Deposition of John William Russell, *attached to* Plaintiffs' Response, at 42.

Subclass A includes class members (i) who retired prior to July 2, 1992; (ii) who retired between July 2, 1992, and July 30, 1995, and who elected to be treated as pre-addendum retirees; or (iii) who are the surviving spouses of these retirees. *Id.* The representatives of Subclass A are Plaintiffs Trull, Henson and Sutton.

## IV. DISCUSSION

■ The Court first addresses the Defendants' contention that the undersigned previously assessed to them an erroneous burden of proof. Defense counsel noted the following in the brief supporting summary judgment:

> In its decision denying the earlier motion for summary judgment this Court suggested that Defendants have the burden of establishing that the Insurance Agreements "clearly and unambiguously" provide that retiree health insurance benefits are not vested. However, the Fourth Circuit has recognized that retiree health insurance benefits are not vested unless the benefit plan documents clearly and expressly state that such benefits are vested.... Thus, the *Plaintiffs* bear the burden of proving by clear and express language that the Insurance Agreements created a vested right to lifetime benefits.

Defendants' Brief, at 19–20 (internal citations omitted). Defense counsel have confused the burden of proof at trial versus the burden the Defendants bear on a motion for summary judgment. As the moving party, the Defendants are obligat-

ed to show there is no genuine issue of material fact. "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat, supra.* If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.* In ruling on the previous, premature motion, the undersigned applied the burden applicable to a motion for summary judgment. The same standard is applied to this motion.

At issue is

> the much-litigated issue of when a right to health benefits that is granted to retired workers by a collective bargaining agreement ... survives the termination of the agreement. The issue must be decided as a matter of federal common law developed under the authority of section 301 of the Taft–Hartley Act, 29 U.S.C. sec. 185, as interpreted in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456–57[, 77 S.Ct. 912, 1 L.Ed.2d 972] (1957)[.] [4]

*Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 541 (7th Cir.2000) (footnote added). Or, as the Fourth Circuit has stated,

> While the question therefore is primarily one of contract interpretation, collective bargaining agreements are not interpreted under traditional rules of contract but under a federal common law of labor policy. Therefore, in order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom

---

4. Although it appears that a more stringent standard is applied to determine whether benefits "vest" under ERISA as opposed to the LMRA, the undersigned does not distinguish between the two for the purposes of this decision because the Defendants did not do so. *See, Keffer v. H.K. Porter Co., Inc.*, 872 F.2d 60 (4th Cir.1989) (LMRA); *Gable v. Sweetheart Cup Co., Inc.*, 35 F.3d 851 (4th Cir.1994) (ERISA).

pertaining to all such agreements. Of course, as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties' intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.

*Keffer*, 872 F.2d at 62 (internal quotations and citations omitted).

■ The 1990 Employee Benefits Agreement provided in Section C for medical benefits for employees "for the duration of this Agreement." Defendants' Appendix Exhibit 8, at MIV005341. Section E of the Agreement provided that employees who retire at age 65 "shall receive the benefits described under the plan." *Id.*, at MIV005361. Although Section E does not define the duration of benefits for the actual retiree, it does state that a surviving spouse and/or dependent would be eligible to receive those benefits "until death or remarriage." *Id.*, at MIV005362. To find that the retiree's benefits expired at the conclusion of the collective bargaining agreement when the plain language of the contract gave his or her spouse a right to the benefits "until death or remarriage" would be an inconsistent interpretation of the contract. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 915 (6th Cir.2000) ("The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.").

In 1992, prior to the expiration of the above Agreement, the company and the Union entered into a "Memorandum of Agreement" which provided that it was an addendum to the existing contract. Defendants' Appendix Exhibit 13, at MIV000101. The addendum provided that the company in the future would not pay more than specified amounts, or caps, for medical insurance premiums for retirees. *Id.* Those caps would not be applied, however, prior to July 2, 1995, and would not be applied in any event "if the plant is closed." *Id.* The addendum did not set out a date by which the plant must be closed in order for its provisions to apply and the addendum applied only to retirees. It is thus clear that the Agreement and addendum made a distinction between active employees and retirees. *Keffer, supra.*

> [W]hen these provisions are read together, they clearly comprehend and apply to two separate categories of persons, with two corresponding classes of benefits and two expected periods of duration. Accordingly, "employees" were to receive group insurance coverage for the duration of the agreement, whereas "retirees," notwithstanding the agreement's expiration, were to receive the described medical coverage [for life].

*Id.*, at 63. "[O]bviously[,] the benefits of active employees are only for as long as the collective bargaining agreement is in effect, since otherwise the employer's potential liabilities would be staggering." *Rossetto*, 217 F.3d at 545. "That the coverage [for spouses and dependents] continue for a specified time after the retiree dies sets at least an outer limit." *Id.*, at 544. "Indeed, to what other date than the death of the retiree or the spouse could the word 'continue' apply?" *Maurer, supra*, at 916.

Moreover, the 1992 addendum clearly provided that caps would be eliminated if the plant were closed, which is exactly what occurred, *albeit* not during the life of the 1990 Agreement. "From this language and the language contained within the collective bargaining agreement itself, it is clear that all of the parties concerned fully anticipated that the Retirees' benefits

would continue beyond the expiration of their collective bargaining agreement—and even beyond cessation of [Dayco's] operation." *Keffer,* 872 F.2d at 63.

Moreover, the first appearance of language reserving to the company the right to amend benefits occurred after the expiration of the 1990 Agreement and 1992 Memorandum of Agreement. Defendants' Appendix Exhibit 11, *supra.* The "reservation of the company's right to modify or terminate the participants' benefits is plainly inconsistent with any alleged intent to vest those benefits." *Gable,* 35 F.3d at 856 (involving a unilaterally bestowed benefits plan subject to ERISA as opposed to a plan for which the retirees had collectively bargained). In the context of a collective bargaining agreement,

> [c]ourts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement. CBAs may contain implied terms, and the parties' practice, usage, and custom can be considered. Retiree benefits are "in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." This is because "[b]enefits for retirees are only permissive not mandatory subjects of collective bargaining. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations."

*Maurer, supra,* at 915 (quoting *Int'l Union, et al. v. Yard–Man, Inc.,* 716 F.2d 1476, 1482 (6th Cir.1983)).

▮ Here, the language in the various agreements concerning the duration of retiree benefits and the application of caps is ambiguous. As a result, extrinsic evidence may be considered. *Int'l Union, et al. v.*

*BVR Liquidating, Inc.,* 190 F.3d 768, 774 (6th Cir.1999); *Keffer, supra.* James Carver testified that although the benefits provided to employees were only for the duration of the collective bargaining agreement, it was common knowledge that the benefits for retirees did not expire with the agreement under which they retired. Earl Johnson testified that the duration period applied only to active employees, not retired employees. Stevenson Kerns, who worked in human resources for the company, testified that when he voiced his opinion to the company that they could modify retirees' benefits, he was told that was not the case by management. And, perhaps the most telling evidence in this case came from Peter Kohler who was present on behalf of the company during many of the contract negotiations. The Union, he testified, was adamant that the retirees' benefits would never be modified because they were viewed as a form of deferred compensation. When the company was forced by FAS 106 to change accounting practices, he and other company officials reassured the Union members, including retirees, that the caps specified in the 1992 and 1995 agreements would never actually be enforced. As the negotiator for the company during the 1995 negotiations, he understood, the company understood, and the Union understood that the caps contained in that agreement would never be enforced. Indeed, the company extracted this language from the Union as consideration for the agreement at the same time as assuring them the caps were "imaginary" and an accounting issue, not real.

If a collective bargaining agreement is completely silent on the duration [or extent] of health benefits, the entitlement to them expires with the agreement, as a matter of law[,] unless the plaintiff can show by objective evidence

that the agreement is latently ambiguous, that is, that anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says.

.  .  .  .  .

If there is language in the [collective bargaining] agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor.... If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting *objective* evidence of meaning.

*Rossetto,* 217 F.3d at 547. Such is the case here and the Defendants' motion for summary judgment will be denied. Any arguments raised by the Defendants which have not been addressed in this decision have been rejected as without merit and/or frivolous.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment as to pre–1995 retirees (Subclass A) is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Defendant Mark IV's motion for oral argument and reply briefing is **DENIED,** and the Defendants' motion for leave to file supplemental reply is also **DENIED.**