**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-2260

PHOENIX RENOVATION CORPORATION, a/k/a Plumbing
Express, a/k/a Phoenix Construction,
Incorporated,

Plaintiff - Appellant,

versus

PETER RODRIGUEZ; RADEK KOCI; ATLANTIC
REPLUMBING, LLC,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. James C. Cacheris, Senior
District Judge. (1:05-cv-01196-JCC)

Argued: November 1, 2007          Decided: December 17, 2007

Before WILLIAMS, Chief Judge, and TRAXLER and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** David Glenn Barger, WILLIAMS MULLEN MAUPIN TAYLOR, McLean,
Virginia, for Appellant. Lawrence J. McClafferty, MCCLANDISH &
LILLARD, Leesburg, Virginia, for Appellees. **ON BRIEF:** David H.
Bruns, Kathleen J. L. Holmes, Thomas J. McKee, Jr., WILLIAMS MULLEN
MAUPIN TAYLOR, McLean, Virginia, for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Phoenix Renovation Corp. ("Phoenix") appeals the district court's order finding Peter Rodriguez, Radek Koci, and Atlantic Re-Plumbing, LLC ("Atlantic") (collectively "Appellees") not liable for damages for copyright infringement and entering judgment in favor of Appellees on Phoenix's tort and contract claims under Virginia law. Phoenix argues that the district court erroneously failed to shift the burden of proof on its copyright claim to Appellees pursuant to 17 U.S.C.A. § 504(b) (West 2000 & Supp. 2006), resulting in the mistaken conclusion that none of Atlantic's revenue was attributable to the copyright infringement. Phoenix further contends that the district court erred in finding that Rodriguez and Koci did not breach their Independent Contractor Agreements with Phoenix by using their memories of the locations at which they had performed work for Phoenix in marketing their competing business and did not violate Virginia's Business Conspiracy Statute, Va. Code Ann. § 18.2-499 (2004 & Supp. 2007) by infringing the copyrighted contract. For the following reasons, we affirm.

I.

The parties do not dispute the relevant facts, which are as follows:

2

## A. Phoenix's Business

Phoenix specializes in providing polybutylene ("PB") replacement services. PB replacement represents a niche business within the plumbing industry that arose after it was discovered that PB pipes are defective and can leak. The market for PB replacement services is finite because once a house's PB pipes have been replaced, there will never be further need for such services in that house.

Phoenix developed and continues to maintain records of the names and addresses of its former customers in a proprietary database. Phoenix considers the addresses contained in the database to be valuable confidential information, because there are no public records identifying buildings that contain PB pipes. Houses with PB pipes, however, are often found on the same street or in the same neighborhoods as other houses with PB. As a result, a company that learns of the existence of PB pipes in one house can often accurately predict that nearby houses also contain PB. Phoenix has therefore developed a system of targeted direct mailing that uses the homes of former customers as "center points" given to direct mail vendors, who then send solicitations to all addresses within defined radii. (J.A. at 340.)

## B. Appellees' Employment/Contracts with Phoenix

Phoenix hired both Rodriguez and Koci as employees in 1995. Rodriguez performed drywall work, and Koci was a licensed master

plumber.  During the course of their employment with Phoenix, both Rodriguez and Koci asked to be treated as independent contractors rather than employees, and Phoenix agreed.  Koci entered into a written Subcontractor Agreement with Phoenix on February 25, 2000, and Rodriguez signed a nearly identical Subcontractor Agreement on March 23, 2000.

The Subcontractor Agreements contained a provision entitled "Disclosure of Trade Secrets and Confidential and Proprietary Information," which provides as follows:

> The Subcontractor shall not, during or at any time after termination of the subcontract, without prior written authorization of the Company, disclose to, or make use of, any trade secret or confidential or proprietary information of the Company or its affiliates.  Trade Secrets and confidential or proprietary information include, but are not limited to: customer lists, price lists, insurance and other third party contracts, marketing and sales plans and concepts, identity of key customer or client personnel and their phone numbers, the identity and requirements of customers and clients, bidding and pricing information, personnel policies and procedures, compensation and fringe benefit programs and offer sales, business plans and methods, computer programs and copyrightable work (models, processes, designs, drawings, plans, prototypes, inventions, devices, parts, improvements and other physical and intellectual property), that were disclosed to the Subcontractor or known by the Subcontractor as a consequence of the subcontract and/or used by the Subcontractor to carry out its duties under this Agreement. . . .

(J.A. at 25.)[1]

---

[1]The Subcontractor Agreements also contained a provision entitled "Non-Solicitation and Covenant Not to Compete," which formed the basis of some of Phoenix's claims before the district court, but is not relevant on appeal.

4

While still working for Phoenix, Rodriguez and his then-roommate, Kenneth Cocolin began to discuss forming a new PB replacement business to compete with Phoenix.[2] They recruited Koci to join their venture. In early June 2003, prior to terminating their subcontractor relationship with Phoenix, Rodriguez and Koci performed several PB replacement jobs in neighborhoods in which they had previously done PB replacement work for Phoenix. Also in June 2003, they took steps to organize their business, which they named "Atlantic Re-Plumbing." (J.A. at 346.) On or about June 18, 2003, Rodriguez and Koci terminated their subcontractor agreements with Phoenix.

C. Appellees' Use of Information Gained from Their Employment with Phoenix

Rodriguez and Koci initially marketed Atlantic's services primarily through the distribution of fliers on the same streets and neighborhoods in which they had performed PB replacement work for Phoenix. In determining which areas to target, Rodriguez and Koci relied on their own memories; neither ever had access to Phoenix's database of customer information.[3]

---

[2]Cocolin and Rodriguez soon disagreed about the nature and scope of Cocolin's duties, causing Cocolin to terminate his relationship with the business after approximately two months.

[3]Phoenix did provide Rodriguez and Koci with "job worksheets" containing the address to which they were to report for each job they did for Phoenix, but neither Rodriguez nor Koci retained any of these job worksheets after forming Atlantic, and at no point did they use the job worksheets to compete with Phoenix.

Rodriguez and Koci eventually began to market Atlantic's services through targeted direct mailing. They compiled mailing lists based on "center points," which were generally locations at which they had performed PB replacement work for Phoenix.

In addition to using their prior knowledge of PB replacement sites to market their services in competition with Phoenix, Rodriguez and Koci also used their knowledge of Phoenix's pricing structure to gain a competitive advantage. Rodriguez had learned of Phoenix's pricing structure for PB replacement services during his employment and subcontractor relationship with Phoenix. He used this knowledge in an attempt to offer Atlantic's services at a lower rate than Phoenix's. Rodriguez and Koci also relied on their memories of what Phoenix had paid them as subcontractors in determining what to pay Atlantic's subcontractors and employees. Although Koci did come across a Phoenix "pay sheet" while moving Atlantic into a new office, neither he nor Rodriguez used or purposefully retained a Phoenix "pay sheet" for use in competition with Phoenix.

D. Appellee's Use of Phoenix's 2002 Interior Re-Pipe Agreement

In its PB replacement business, Phoenix uses a consumer contract known as the "2002 Interior Re-Pipe Agreement." While Rodriguez and Koci worked with Phoenix, the 2002 Interior Re-Pipe Agreement was neither marked as copyrighted nor kept hidden from

6

independent contractors, and Rodriguez and Koci were not advised that it was confidential or protected by copyright.

Rodriguez and Koci retained a copy of the 2002 Interior Re-Pipe Agreement after terminating their Subcontractor Agreements with Phoenix. In or about June 2003, they retained an attorney to determine whether they could use the 2002 Interior Re-Pipe Agreement in their new business. The attorney advised Rodriguez and Koci that they were entitled to use the document, which was not subject to copyright protection. Nevertheless, Rodriguez and Koci requested that Pugh draft a new consumer contract for Atlantic's use. Pugh drafted the new contract (hereinafter "the Infringing Contract") by making minor revisions to the 2002 Interior Re-Pipe Agreement.

Appellees first used the Infringing Contract on August 30, 2003. They then used the Infringing Contract intermittently until mid-to-late October 2005, at which point they began to use the Infringing Contract on virtually all of their PB replacement jobs. Prior to that time, Appellees had been using a form contract purchased from an office supply store to serve the same ends. The switch to the Infringing Contract reflected Rodriguez and Koci's belief that "it looked more professional" than the form contract they had been using. (J.A. at 114.)

Generally, execution of the written agreement with a customer was the final step before Atlantic began work. First, Atlantic

visited the potential work site, performed an estimate of the cost of its services, and quoted the proposed price to the customer. If a customer accepted the proposal, Atlantic scheduled a work date. Atlantic never sent the Infringing Contract to a customer until after the customer had accepted its proposal and scheduled a work date. In many cases, Atlantic did not send the Infringing Contract to the customer until the customer had paid a deposit equal to one-third of the estimated price.

Appellees did not use the Infringing Contract to market Atlantic's services. Rather, they obtained business through fliers, signs, and postcards, as well as through neighborhood referrals, the Long & Foster Home Service Connection, and their own website. Customers selected Atlantic for a variety of reasons, including experience and price. No customer ever told Rodriguez or Koci that he or she selected Atlantic based on the Infringing Contract.

On several occasions, Appellees relied on the Infringing Contract to collect balances owed by customers. Specifically, Atlantic issued written correspondence citing specific provisions of the Infringing Contract to five customers: Oakley, Polk, Bennet, Quagliata, and Neal. Oakley remitted a sum fully satisfying the unpaid balance, accompanied by a note stating that he paid because he was pleased with Atlantic's work. Polk failed to pay in full, and Atlantic spent approximately $1,500 in legal fees to collect

8

the $1,606 owed. Bennet did not respond to two attempts at collecting payment, and Atlantic eschewed further efforts to collect the $400 owed, concluding that it would have been more costly to enforce the contract than to collect the unpaid balance. Atlantic spent approximately $7,000 in legal fees to collect the balance of $3,618 owed by Quagliata. Atlantic also spent between $1,000 and $1,500 in legal fees trying to enforce the Infringing Contract against Neal, but failed to collect any of the funds he owed to Atlantic.

On August 4, 2005, Phoenix registered the 2002 Interior Re-Pipe Agreement with the United States Copyright Office. In September 2005, Appellees' counsel informed Rodriguez and Koci that they were not entitled to use the Infringing Contract. Appellees then paid counsel $2,711 to draft a new contract. Nevertheless, Appellees continued to use the Infringing Contract consistently until December 12, 2005, and then intermittently until January 2006, when, after 626 total uses, they ceased using the Infringing Contract altogether.

### E. The Present Litigation

On October 14, 2005, Phoenix filed a nine-count complaint against Appellees in the United States District Court for the Eastern District of Virginia, alleging: Copyright Infringement against Atlantic, Koci, and Rodriguez (Count I); Breach of Subcontractor Agreement against Koci and Rodriguez (Counts II-III);

9

Tortious Interference with Contract & Business Expectancy claims against Atlantic, Koci, and Rodriguez (Counts IV-VI); Violation of Virginia's Business Conspiracy Statute against Atlantic, Koci, and Rodriguez (Count VII); Unfair Competition against Atlantic, Koci, and Rodriguez (Count VIII); and Common Law Conspiracy against Atlantic, Koci, and Rodriguez (Count IX).[4]

Appellants filed a Motion to Dismiss the complaint. On December 8, 2006, the district court denied the motion with respect to Counts I-VII and Count IX, but granted the motion with respect to Count VIII (unfair competition).

Thereafter, the parties filed cross-motions for partial summary judgment. In addressing the motions, the district court found that as of August 5, 2005, the date the United States Copyright Office registered the 2002 Interior Re-Pipe Agreement as an original work authored by Phoenix, Phoenix possessed a valid, registered copyright. Accordingly, the district court granted summary judgment in favor of Phoenix on the issue of liability on Count I. It denied Appellees' motion for partial summary judgment on the issue of damages for the copyright infringement, reserving the question for trial. The court also held that the covenant not to compete contained in the Subcontractor Agreements was invalid

---

[4]Phoenix had previously filed a state court action against Appellants on August 27, 2003. Phoenix voluntarily nonsuited that action, however, in order to bring a copyright claim in federal court.

10

under Virginia law and therefore granted Appellees' motion for partial summary judgment to the extent that it sought dismissal of the claims based on that provision.

A three-day bench trial took place in July 2006. Thereafter, on October 25, 2006, the district court entered judgment in favor of Phoenix on the copyright claim (Count I), and in favor of Appellees on the remaining counts. The district court enjoined Appellees from further infringement of the copyrighted 2002 Interior Re-Pipe Agreement, but found that Appellees were not liable for any damages.

Phoenix noted a timely appeal, and we have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006) (providing for appellate jurisdiction over "final decisions" of the district courts).

II.

We review de novo the district court's legal conclusions. Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 512 (4th Cir. 2002). We review factual findings for clear error, meaning that we "may only set aside such a finding when we are left with the definite and firm conviction that a mistake has been made, and we may not do so simply because we might have found to the contrary." Id. In considering mixed questions of law and fact, "we review the factual portion of the inquiry for clear error and the legal conclusions de novo." Id.

11

Phoenix raises three principal issues on appeal, arguing that the district court erred in finding: (1) that Phoenix was not entitled to damages for Appellees' infringement of its copyrighted contract, (2) that Koci and Rodriguez did not violate their Subcontractor Agreements in marketing Atlantic; and (3) that Appellees' copyright infringement did not violate Virginia's Business Conspiracy statute. We address each argument in turn.

A.

The district court granted summary judgment to Phoenix on the issue of liability for infringement of the copyrighted 2002 Interior Re-Pipe Agreement, a determination Appellees do not appeal. A finding of liability, however, does not, without more, establish an entitlement to damages. Under Section 504(b) of the Copyright Act, a copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C.A. § 504(b). In this case, Phoenix did not seek actual damages, limiting its claim to so-called "infringer's profits."[5]

---

[5]Phoenix also recognized that it could not seek statutory damages under 17 U.S.C.A. § 504(c) (West 2000 & Supp. 2006) because the infringement commenced prior to the effective date of the copyright registration. 17 U.S.C.A. § 412 (West 2005); Bouchat v. The Bon-Ton Dep't Stores, Inc., --- F.3d ---, 03-2173 slip op. at 30-34 (4th Cir. Oct. 17, 2007) (explaining that a copyright plaintiff is not entitled to statutory damages for continuing

12

Section 504(b) contains a burden shifting provision which provides that, "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C.A. § 504(b). Thus, "§ 504(b) creates an initial presumption that the infringer's profits attributable to the infringement are equal to its gross revenue." Bonner v. Dawson, 404 F.3d 290, 294 (2005) (internal quotation marks and alteration omitted). Once the copyright holder establishes the infringer's gross revenue, "the burden shifts to the infringer to prove either that part or all of those revenues are 'deductible expenses' (i.e., are not profits), or that they are attributable to factors other than the copyrighted work." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 520 (4th Cir. 2003) (internal quotation marks omitted).

In Bouchat, we established that because the phrase "gross revenue" in § 504(b) refers only to revenue reasonably related to the infringement, "a copyright holder must show more than the infringer's total gross revenue from all of its revenue streams" in order to meet its initial burden under the statute. Bonner, 404 F.3d at 294. Accordingly, before the burden-shifting provision of § 504(b) is triggered, the copyright owner must "demonstrat[e] some

infringement commenced before registration).

13

causal link between the infringement and the particular profit stream." Id.

Here, in denying Appellees' Partial Motion for Summary Judgment as to damages for the copyright infringement, the district court found that Phoenix had met its initial burden of proof. First, the district court noted that Phoenix did not indiscriminately seek the totality of Appellees' profits without regard to the source, but rather "anticipate[d] presenting evidence at trial that [Appellees'] use of Phoenix's Interior Repipe Agreement enabled [them] to enter into 626 transactions in which they received approximately $2.6 million in revenue." (J.A. at 68.)[6] Next, the district court identified three factors demonstrating a causal connection between the use of the Infringing Contract and the claimed revenue: (1) Virginia law required Atlantic to have a written contract to engage in residential contracting, a requirement Atlantic met through use of the Infringing Contract; (2) use of the Infringing Contract allowed Appellees to market Atlantic as a less expensive version of Phoenix and to appear polished and professional, thereby generating more customers and more revenue for Atlantic; and (3) the Infringing Contract had a "revenue-saving effect" because Atlantic used it to

---

[6]The district court also stated that it might well have been appropriate for Phoenix to offer the totality of Atlantic's profits as "gross revenue" because Atlantic had only one revenue stream –– income from PB replacement services.

14

collect payments from customers with overdue balances. (J.A. at 71-73.) Finally, the district court stated that Phoenix had provided non-speculative evidence of a causal connection and determined that "[b]ecause the claimed revenue ha[d] a reasonable relation to the infringement, . . . summary judgment for [Appellees] would be inappropriate." (J.A. at 73.)

Following the bench trial, however, the district court changed course, finding Appellees not liable for damages. The court found that Phoenix failed to provide evidence supporting each of its three purported causal links. With regard to Phoenix's theory that the contract assisted Atlantic in marketing itself to customers, the district court concluded that Appellees had presented credible evidence establishing that customers hired Atlantic for reasons such as its experience and price, not the appearance of its contract, while "Phoenix ha[d] not presented any evidence that supports this particular causation theory." (J.A. at 358.) It therefore deemed the "purported causal link . . . mere speculation." (J.A. at 358.) The district court further concluded that although use of the Infringing Contract allowed Atlantic to comply with Virginia's requirement that residential contractors make use of written contracts for a time without incurring the expense necessary to do so, any cost avoidance was temporary and did not permanently contribute to Atlantic's revenues because Atlantic later paid an attorney to draft a new contract. Finally,

15

the district court found that none of Atlantic's revenue was attributable to its use of the Infringing Contract in collecting balances owed because Atlantic only collected more money than it cost to enforce the terms of the contract on one occasion, and the proceeds from that collection effort were more than offset by the $7,000 Atlantic spent to collect $3,618 owed on another occasion. Moreover, Atlantic had proven unsuccessful in other collection attempts. The district court therefore concluded that "Phoenix ha[d] not proven the existence of a causal link between [Appellee's] infringement of the Re-Pipe Agreement and their gross revenue from polybutylene replacement jobs where the Infringing Contract was used." (J.A. at 360.) Accordingly, it determined that "the burden-shifting provisions of § 504(b) [were] inapplicable to this case" and Phoenix was not entitled to damages. (J.A. at 360.)

Phoenix argues that the district court's about face improperly denied it the benefit of § 504(b)'s burden shifting provision, depriving it of damages to which it is entitled. Phoenix claims to have met its minimal initial burden of demonstrating some causal link between the infringement and the revenue stream by showing that (1) customers' obligation to pay Atlantic arose out of the Infringing Contract, and (2) Atlantic benefitted from the use of the contract, which allowed it to appear more professional, conduct its business in accordance with Virginia law, and collect payment

16

from reluctant customers.[7]  Appellees counter that the district court correctly applied our holding in Bouchat that a defendant should prevail if either (1) there exists no conceivable casual connection between the infringement and a particular revenue stream, or (2) despite the existence of a conceivable connection, the copyright holder offers only speculation as to the existence of a causal link between the infringement and the claimed revenues. Bouchat, 346 F.3d at 522-23.

As an initial matter, we agree with Phoenix that the district court erred in failing to shift the burden of proof to Appellees pursuant to § 504(b).  Although Bouchat held that copyright plaintiffs may not meet their initial burden under the statute simply by submitting evidence of an infringer's gross profits from all of its revenue streams, in requiring proof of a causal link between the infringement and a particular profit stream or streams, we did not purport to saddle plaintiffs with an onerous evidentiary burden.

Bouchat involved a suit for "infringer's profits" by the author of an original drawing that became the basis for the

_____

[7]Phoenix also argues that the district court's conclusions in its summary judgment order represent the "law of the case," that could not be altered by subsequent orders of the district court. Because Phoenix does not suggest that we are similarly bound by the district court's initial conclusions, we need not address this argument.  We thus limit our review to the correctness of the district court's judgment, not its consistency with any earlier (non-final and unappealable) orders.

Baltimore Ravens football team's logo.  The Ravens obtained revenue from a variety of sources, including a subset of merchandise sales, "minimum guarantee" shortfalls and "free merchandise" requirements established by the Ravens's licensing agent (National Football League Properties, Inc.), that could not fluctuate in response to consumer behavior.  We held that Bouchat had not met his initial burden of proof under § 504(b) only with regard to those sources because Bouchat could not establish a conceivable connection between the revenue from the "minimum guarantee" shortfalls and "free merchandise" requirement and the copyright infringement. Bouchat, 346 F.3d at 524.

Our subsequent decision in Bonner clarified the extent of the causal connection required under Bouchat.  There, we distinguished Bouchat on the ground that Bonner was not seeking all gross revenues from a defendant with multiple streams of income, but rather only the revenue derived from the leasing arrangements of an infringing building.  We concluded that because "[t]he building generating the funds was designed based upon Bonner's copyright," Bonner had satisfied Bouchat's requirement of a causal connection between the infringement and the revenue stream.  Bonner, 404 F.3d at 294.  We reversed the district court's conclusion to the contrary, holding that the district court had "misinterpreted the level of connection between infringement and profits that is required under Bouchat" when it determined that Bonner had not met

18

his initial burden because it was not clear that the building's design formed the basis of the profits from the lease. Id.; see also Konor Enter. Inc. v. Eagle Publ'ns Inc., 878 F.2d 138, 140 (4th Cir. 1989) (holding that where a defendant's only product was a military telephone directory that infringed on a plaintiff's copyright, the burden of proof shifted to the defendant pursuant to § 504(b), because "[i]t [wa]s plausible, absent proof to the contrary, that all profits were a direct result of [the] infringement of [the] copyright").

In this case, the district court's summary judgment order correctly followed Bouchat and Bonner to conclude that Phoenix had met its initial burden under § 504(b) of demonstrating a conceivable connection between the copyright infringement and the revenue obtained from jobs on which Appellees used the Infringing Contract. Such a connection exists because customers' obligation to pay arose out of their contract with Atlantic and because it is conceivable that the Infringing Contract generated revenue by: (1) enabling Atlantic to attract customers by looking like a less expensive version of Phoenix; (2) comply with state law governing its business; and (3) collect past due balances. The district court erred in concluding to the contrary in the opinion and order entering the final judgment.

Nevertheless, we agree with Appellees that this flaw in the district court's analysis did not affect the outcome of the case.

19

A review of the record compels the conclusion that the district court's finding that Phoenix was not entitled to damages ultimately was based on its finding that the evidence was entirely one-sided, not on its allocation of the burden of proof. The court credited Appellees' evidence that none of Atlantic's revenue was attributable to the Infringing Contract and found that Phoenix had offered only speculation to the contrary. Thus, the district court's finding that Phoenix failed to supply any non-speculative evidence to counter Appellees' showing that Atlantic's revenue stemmed from sources other than the copyright infringement, if correct, compels the conclusion that Phoenix was not entitled to damages.[8]

---

[8]Phoenix argues that its satisfaction of its initial burden of proof under § 504(b) established its entitlement to damages. It claims that the district court might find that Atlantic has met its burden of proving some of its revenue attributable to sources other than the Infringing Contract and apportion damages accordingly, but that it cannot properly determine that none of Atlantic's revenue was attributable to the Infringing Contract. This contention contradicts our precedent, which plainly provides that a defendant may prove that no portion of its revenue derives from its infringement of a plaintiff's copyrighted work. In <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514 (4th Cir. 2003), although Bouchat had met his initial burden of proof by establishing a conceivable connection between infringement of his copyrighted drawing and the Ravens' revenue from sources other than merchandise sales, we upheld a grant of summary judgment to the Ravens on the issue of damages related to those sources. We concluded that Bouchat's speculation that the alleged connection in fact existed was insufficient to overcome the Ravens' proof that the non-merchandise revenue was attributable to sources other than the infringement because "[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [his] pleadings," but rather must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 525

With regard to Phoenix's argument that the Infringing Contract aided Atlantic in attracting customers, the district court found that "Phoenix ha[d] not presented any evidence that supports this particular causation theory." (J.A. at 358.) In contrast, it credited Appellees' evidence that customers chose Atlantic for reasons such as experience and price and that the contract merely reflected the final step in entering into an agreement with customers that had already decided to do business with Atlantic. Phoenix argues that Koci's testimony that some customers "didn't like" or "even refused to sign" the Infringing Contract shows that Atlantic's use of the Infringing Contract did affect its revenues. (Appellant's Br. at 32.) That some customers may have been turned off by the Infringing Contract, however, does not demonstrate that others employed Atlantic because of it. The record contains no evidence that a single customer chose Atlantic due to the Infringing Contract or that any customer declined to do business with Atlantic based on the form contract it first used or the non-infringing contract it developed in 2005. Accordingly, we can find no basis to overturn the district court's finding that Phoenix

(internal quotation marks omitted). Similarly, in Bonner v. Dawson, 404 F.3d 290 (2005), we concluded that a plaintiff that was erroneously deprived of the benefit of § 504(b)'s burden-shifting scheme was not entitled to judgment as a matter of law after a jury failed to award any damages because the defendants had presented sufficient evidence for a jury to conclude that they had met their burden of proving that none of their profits in fact stemmed from the infringement. Bonner, 404 F.3d at 294-95.

presented no evidence in support of its theory that the Infringing Contract assisted Appellees in attracting customers.

The district court's conclusion concerning Appellee's use of the Infringing Contract to satisfy the requirements of Virginia law is likewise well-founded. Because Appellees presented evidence that they paid a lawyer to draft a new contract, the district court found that any cost savings the Infringing Contract provided Appellees in meeting Virginia's statutory requirement that licensed residential contractors "make use of a legible written contract clearly specifying the terms and conditions of the work to be performed" was merely temporary. 18 Va. Admin. Code § 50-22-260(b)(8) (2007). Indeed, Appellees' use of the Infringing Contract may have caused them to spend more money than they otherwise would have because they first paid an attorney to consult with them and draft the Infringing Contract and were later obliged to pay a different attorney for another contract. Moreover, Appellees demonstrated that before they began using the Infringing Contract, they were able to comply with applicable law through the use of a form contract from an office supply store.

Turning to the issue of whether use of the Infringing Contract enabled Atlantic to obtain revenue from customers who otherwise would not have paid, we first note that Phoenix does not contest the district court's finding that although Atlantic relied on "revenue-saving" language in the Infringing Contract to collect

22

payments on five occasions, the cost of collection outweighed the revenue received. Rather, Phoenix contends that the district court arbitrarily selected for discussion a handful of cases, ignoring that they did not represent the only instances in which Appellees quoted or referred to the Infringing Contract when dealing with customers. We cannot, however, characterize the district court's focus on the five occasions as arbitrary. The district court discussed in its opinion those contracts that Phoenix discussed at trial; after trial, Phoenix submitted to the judge's clerk boxes of documents containing 600 additional job files that it had not specifically addressed in its arguments to the district court.

Moreover, the district court could properly differentiate between instances when Atlantic enforced specific contractual provisions against customers that refused to comply with the agreement from occasions in which Atlantic simply quoted or referenced the contract when it sent out a bill for services rendered. In the latter case, there is no indication that the customer would not have returned payment but for the specific "revenue saving" language in the Infringing Contract. Indeed, one of the instances on which Phoenix focuses seems to undermine its argument that Atlantic successfully used the Infringing Contract's "revenue-saving" provision to collect full payment while avoiding responsibility for certain types of property damage claims. Phoenix supplied documents from the "Baer case" as an example of

23

the particular effectiveness of the Infringing Contract.  In that case, however, the Baers paid for Atlantic's work, but then lodged a complaint with the Better Business Bureau because they believed that a reduction in the price was warranted due to delays and inconvenience caused by Atlantic.  Ultimately, Atlantic sent the Baers a $400 "monetary settlement" <u>despite</u> its belief that it was not required to do so under the contract.  (J.A. at 495.)  We therefore conclude that the district court's finding that the Infringing Contract's "revenue-saving" language "did not, in actuality, contribute to [Appellees'] gross revenue," (J.A. at 360), was not clearly erroneous.

In light of the district court's findings that Appellees' use of the Infringing Contract to comply with 18 Va. Admin. Code § 50-22-260(b)(8) and to collect balances owed from reluctant customers did not augment its revenues and Phoenix's failure to provide more than speculation that the Infringing Contract aided Appellees in marketing Atlantic's services, we conclude that the district court did not err in finding Appellees not liable for damages for copyright infringement.

B.

We next address Phoenix's breach of contract claim.  Under Virginia law, when the terms of a contract are clear and unambiguous, the interpretation of those terms presents a question of law.  <u>Musselman v. Glass Works, L.L.C.</u>, 533 S.E.2d 919, 921 (Va.

24

2000). Whether a contractual provision is ambiguous is also a question of law. Id.[9]

The confidentiality agreement contained in Rodriguez's and Koci's Subcontractor Agreements prohibited the use or disclosure of "any trade secret or confidential or proprietary information of [Phoenix]," including, among other things, "the identity and requirements of customers and clients." (J.A. at 25.) The district court found that Rodriguez and Koci used knowledge gained from their work for Phoenix in conducting their business. It then concluded that this information could not properly be characterized as trade secrets, confidential information, or proprietary information. The district court further concluded that the contractual provision prohibiting disclosure of customers' identity, on its face, did not prohibit the use or disclosure of

---

[9]Under Virginia law, an agreement in restraint of trade must be strictly construed against the drafter. Simmons v. Miller, 544 S.E.2d 666, 678 (Va. 2001). Although Virginia courts have not directly addressed the issue, a number of other state courts have construed confidentiality provisions that operate to restrict competition as contracts in restraint of trade. See, e.g., Carolina Chem. Equip. Co. v. Muckenfuss, 471 S.E.2d 721, 723-24 (S.C. 1996) (stating that an agreement not to divulge trade secrets will be judged by the same criteria as a covenant not to compete when the former has the same effect as the latter). The district court treated the confidentiality provision contained in the subcontractor agreements as a restraint on trade and strictly construed the provision against Phoenix. Because the language of the contract is plain, the same result would obtain whether or not it were strictly construed against Phoenix. Accordingly, we need not address this issue on appeal.

25

the addresses of customers for whom Phoenix had previously done work.

Phoenix contends that the district court erred in its interpretation of the contract. Phoenix's arguments rest primarily on the fact, acknowledged by the district court, that knowledge of the addresses of houses with PB pipes can represent valuable information because it enables a PB replacement business to target its marketing to areas in which people will have a need for their services. The mere fact that Koci's and Rodriguez's memories of the addresses proved useful in marketing or valuable to their competing business, however, does not establish that the knowledge is covered by the specific provisions of the Subcontractor Agreement or properly recognized as a trade secret under Virginia law.

The confidentiality agreement's reference to the "identity and requirements of customers," given its ordinary and plain meaning, unambiguously refers to who Phoenix's customers are and what they need. See Twardy v. Twardy, 419 S.E. 2d 848, 855 (Va. Ct. App. 1984) ("Where there is no ambiguity in the terms of a contract, we must construe it as written, and give the terms their plain and ordinary meaning." (internal quotation marks and alteration omitted)). It cannot logically be read as inclusive of the addresses of former customers. Phoenix easily could have included a specific reference to the addresses in the agreement, but did

26

not, and we must construe the contract as written, not as Phoenix wishes it had been drafted. See Wilson v. Holyfield, 313 S.E. 396, 398 (Va. 1992) (explaining that "courts are bound to say that the parties intended what the written instrument plainly declares" and "cannot read into contracts language which will add to or take away from the meaning of the words already contained therein" (internal quotation marks omitted)).

Phoenix contends that even if the specific reference to the "identity and requirements of customers" does not extend to the addresses of former customers, the addresses are nevertheless covered by the confidentiality agreement's generalized reference to "trade secret[s] or confidential or proprietary information." Under Virginia law, however, Rodriguez's and Koci's knowledge of Phoenix's customers and their addresses was neither a trade secret nor confidential or proprietary information belonging to Phoenix. See Peace v. Conway, 435 S.E.2d 133, 135 (Va. 1993) (holding that former employees who formed a competing business and used a list compiled solely from their memories to solicit their former employer's customers had not misused confidential information, because they "did not . . . utilize any property that belonged to [their former employer] when contacting his customers"). Rodriguez and Koci did not use Phoenix's proprietary database in conducting their marketing campaign. And, although their memory of the addresses represented valuable information, it was neither secret

27

nor solely in Phoenix's possession because the customers (and possibly their neighbors and friends) knew who they were. We therefore conclude that Koci and Rodriguez did not breach their Subcontractor Agreements by relying on their memories of addresses at which they had done work for Phoenix in marketing Atlantic's services. Cf. Plains Cotton Coop. Ass'n v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1263 (5th Cir. 1987) ("While an employee owes a duty to his employer not to disclose any knowledge of that employer's trade secrets, the employee, upon terminating his employment relationship with his employer, is entitled to take with him the experience, knowledge, memory, and skill, which he gained while there employed." (internal quotation marks and alteration omitted)).

C.

Finally, we consider Phoenix's statutory conspiracy claim. Virginia's Business Conspiracy statute makes it unlawful for two or more persons to "combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession . . . ." Va. Code Ann. § 18.2-499. Phoenix claimed that Appellees violated the statute by conspiring to infringe on their copyright. The district court granted judgment in favor of Appellees, reasoning that the claim failed for a number of reasons. First, there could have been no conspiracy to infringe upon the copyright

28

in 2003 because the 2002 Interior Re-Pipe Agreement was not copyrighted at that time.  Second, the requirement that two or more persons act in concert was not met because, under the Intracorporate Immunity doctrine, a corporate entity, which acts only through its agents, cannot conspire with itself, so a conspiracy could not exist if Rodriguez and Koci were both agents of Atlantic and were acting within the scope of their agency. Third, the infringement occurring after the copyright was registered was not willful or malicious.

Phoenix challenges each basis for the district court's decision, arguing that (1) it was irrelevant that the copyright was not actually registered until 2005; (2) the doctrine of intracorporate immunity does not apply because Rodriguez and Koci began conspiring to infringe on the copyright while they were still subcontractors of Phoenix, before they formed Atlantic; and (3) Appellees acted willfully and maliciously in using the contract over Phoenix's objection.  Because the question of intracorporate immunity is dispositive, we address only that issue.

Under Virginia law, a corporation cannot conspire with its agents, nor can agents of a corporation, acting within the scope of their agency, conspire together.  Such a "conspiracy" is a legal impossibility because the actors are not separate persons for purposes of the conspiracy statute, but rather form part of a single entity, the corporation, which cannot conspire with itself.

29

See <u>Charles E. Brauer Co. v. NationsBank of Va., N.A.</u>, 466 S.E.2d 382, 386-87 (Va. 1996); <u>Fox v. Deese</u>, 362 S.E.2d 699, 708 (Va. 1987).

Phoenix's assertion that Rodriguez and Koci conspired to use the 2002 Interior Re-Pipe Agreement before forming Atlantic is unsupported by the record. Rodriguez and Koci formed Atlantic in June 2003, and there is no evidence that, prior to June 2003, they agreed to use the 2002 Interior Re-Pipe Agreement in their new business. To the contrary, Appellees used a form contract from an office supply store on their initial jobs and did not use the Infringing Contract until August 30, 2003, after requesting that an attorney draft them a contract for use in their business. Accordingly, we conclude that the doctrine of intracorporate immunity applies, and because Phoenix cannot establish concerted activity by two or more persons, its statutory conspiracy claim must fail.

## III.

In sum, we conclude that although the district court erred in concluding that Phoenix failed to meet its initial burden of proof under § 504(b) of the Copyright Act, its judgment in favor of Appellees was nevertheless sound because it correctly concluded that there was no evidence that Appellees' infringement of Phoenix's copyright contributed to Atlantic's revenues. We further

conclude that the district court did not err in entering judgment in favor of Appellees on Phoenix's claims under Virginia law because the Subcontractor Agreements do not prohibit the use of Rodriguez's and Koci's memories of addresses at which they performed work for Phoenix in targeting Atlantic's marketing and because the doctrine of intracorporate immunity bars the statutory conspiracy claim. Accordingly, the judgment of the district court is

AFFIRMED.